MARY AITA, Appellant, v. JOHN BENO COMPANY et al., Appellees.

DECEMBER 14, 1928.

*Albert McGinn,* for appellant.

*Kimball, Peterson, Smith & Peterson* and *Lynn S. Alberti,* for appellees.

MORLING, J.—I. Plaintiff testified that, on February 9th:

"I was injured in front of Beno's. I was just walking east on the street. I was in the middle of the big window to the east of the door; that is where I was injured, or the accident happened. * * * They were washing windows,—just came down with that brush, and hit me down so fast,—he got the stick between my legs, and I just dropped down. The stick was about 10 or 12 feet long. I don't know what happened to me; I just fell down on the walk, and I didn't know myself for a little while. * * * I don't know myself how I was hurt, but I felt when I dropped, and the people saw when I didn't get up, and they ran and picked—and I looked at this hand * * * I did not know the man who was washing the windows, personally. He was washing those windows. * * * I was half way between the building and the curb; was alone. There were quite a few people on the street right in front of Beno's; they were on both sides, going in both directions. * * * There was no warning given of any kind about this man, doing that work."

She also testified:

"As I was passing there, I noticed this man washing the windows. I saw his pail and his pole. Q. You saw all that be-

fore you were hurt? A. No, I didn't see it before; I just raised up my head, and then I saw the stick between my legs, and of course it tripped me over. Q. So you didn't see anything until it was all over? A. Well, I saw the pole. Q. Was that all? A. And I seen him, too. I didn't see him before I fell; I saw him after I fell, and when I turned my head, I saw him. He never even stopped. All the people were waiting there to see me get up."

Another witness testified:

"I saw the accident. I saw Mrs. Aita come walking up the street. I was standing in front of the dime store, rather to the west side of Beno's store, and Mrs. Aita came up the street; and when she got to the east window of Beno's, somebody was washing a window there, and just as she got there, run down the stick like, and caught her behind this leg, and in front of this leg, and threw her on her left side, this way [indicating], with her face on the pavement."

The pole must have been at least 10 or 12 feet long. This witness says the accident happened between 3 and 4 o'clock. Plaintiff's son testified that, in conversation with the vice president of the defendant company:

"I [witness] said, 'It seems very careless to allow a man to use a long-handled pole out on a busy thoroughfare like this, in front of this place, on this kind of a day, especially,' and he said: 'We have stopped him from using that long handle. I regret this affair very much, and I don't think it will happen again,—at least we will try not to let it happen again.' "

This comprises all of the evidence of the cause and circumstances of plaintiff's fall. Plaintiff's age is not shown, further than that she is the mother of two adult children. The state of the weather, how she was wrapped, how fast she was traveling, are not shown. The record is silent as to her condition of physical or mental alertness, or her power of observation through her senses of sight and hearing, further than as may be inferred from the testimony above set out. No attempt was made to show further what, if any, care she took to observe or avoid collision with Baron or the pole he was using. How many people were on the walk at the time; whether they were jostling each other or

plaintiff or Baron; what observation the window washer was taking of the passers-by; what effort he was making, if any, to avoid contact with passers-by; what difficulty there was, or absence thereof, in avoiding contact or jostling; what precautions, if any, were necessary or adopted, either on his part or on plaintiff's part; in short, what the plaintiff was doing, and what Baron was doing; what the dangers were, and to whom; and what was required, both on the part of plaintiff in avoiding injury and upon the part of Baron, and not only upon plaintiff, but other pedestrians; the facts from which the deduction of exercise of or failure to exercise reasonable care by plaintiff and defendant might be made,—are not in evidence. ·

Plaintiff, to recover, was under the necessity of proving: (1) That Baron was not in the exercise of reasonable care in the use of the pole; (2) that the plaintiff was free from negligence on her part, proximately contributing to her fall; (3) that her fall was the proximate result of Baron's negligence; and (4) that she sustained injuries therefrom.

. Her statement "he got the stick between my legs" means nothing on the question of negligence, when considered in connection with her other statements:

"I don't know what happened to me. I just fell on the walk * * * I don't know myself how I was hurt, but I felt when I dropped. * * * I didn't see it before I just raised up my head, and then I saw the stick between my legs, and of course it tripped me over. * * * I didn't see him before I fell. I saw him after I fell, and when I turned my head, I saw him. He never stopped."

For all that appears, she blindly ran into Baron, or into his implement. Other pedestrians might have jostled her or him. Baron might have had sufficient space in which to freely operate his cleaner. His bucket and pole were in plain sight, and it might have been apparent to him that the approaching pedestrians, including plaintiff, were observing and avoiding him. In short, how the interposition of the pole between plaintiff's legs came about, whether from plaintiff's negligence, whether from the act of other persons on the walk, or whether from the negligence of the defendant, or from a combination of two or more of these causes, is a matter of the merest guess and conjecture.

The witness's statement that (Baron) the window washer, just as plaintiff "got there, run down the stick like, and caught her behind this leg and in front of this leg, and threw her on her left side," is, for the same reasons, insufficient to show fault on the part of Baron, proximately causing the injury, or absence of fault on the part of plaintiff, contributing to it. So the statement of the vice president, as testified to by the son, does not purport to be a relation of any facts or an admission of liability, even though such admission, if made, could be accepted as proof of negligence of the corporation and absence of negligence in plaintiff.

Plaintiff invokes the doctrine of *res ipsa loquitur*, "the thing speaks for itself." But this thing in question here does not speak for itself. The control of the pole is not shown to have been exclusively in Baron, as against the motions of the plaintiff and others. The instrumentality was not peculiarly, in that respect, within Baron's control. It is manifest that no presumption of want of ordinary care on the part of Baron is raised by the facts shown in evidence. That the accident was the proximate result of such negligence, rather than of numerous other possible causes, including the negligence of the plaintiff herself, is wholly conjecture. The facts shown are as consistent with other hypotheses, including that of plaintiff's negligence, as with the theory of defendant's negligence. The doctrine of *res ipsa* has no application to the facts of this case. *Texas & Pac. Coal Co. v. Kowsikowsiki*, 103 Tex. 173 (125 S. W. 3); *Denver & R. G. R. Co. v. Ashton-Whyte-Skillcorn Co.*, 49 Utah 82 (162 Pac. 83); 8 Thompson's Commentaries on the Law of Negligence, Section 7635; 45 Corpus Juris 1211; *McGrath v. St. Louis Transit Co.*, 197 Mo. 97 (94 S. W. 872); *Carter Oil Co. v. Independent Torpedo Co.*, 107 Okla. 209 (232 Pac. 419).

The doctrine as it has been adopted and applied in this court excludes its application here. *Larrabee v. Des Moines Tent & Awning Co.*, 189 Iowa 319; *Cahill v. Illinois Cent. R. Co.*, 148 Iowa 241; *Basham v. Chicago G. W. R. Co.*, 178 Iowa 998.

II. Defendant company contends, also, that Baron was not its servant, but an independent contractor. For seven years before the trial, Baron, under the name "National Window Clean-

1366

ing Company," had been conducting the business of window washing; washed "windows all over town," for twenty firms; furnished all his own implements and material except water. He seems to have done some general cleaning. Baron says his agreement with defendant company was: "I was to wash the windows twice a week outside, and every two weeks inside." He testified:

"And if he [the employer] were to tell you about a certain window, not being in proper order, you would proceed to do whatever he told you to do, wouldn't you? A. Yes. * * * Everybody. * * * Q. And if they complained, you would do the work as they told you to do it? A. Yes, sir. * * * Q. And supposing that a member of the Beno firm came to you, and pointed out to you, you would go and clean that, wouldn't you? A. No, that spot, I take a chamois and wipe off that spot."

The Beno Company's director, who had "supervision of the cleaning of the establishment," says:

"The proposition outlined by him was to wash our windows whenever they needed it, and in other words, take all the responsibility of keeping them clean out of our hands. * * *. I don't remember that anything was said; it was just generally understood to furnish his own equipment, simply because we had nothing of that nature, to speak of, in our store. He said that he would keep the windows clean, wash them whenever they needed it, at whatever time they needed it. He said that he would do this work—as near as my memory serves me—for $12.50 a month."

Witness says that he never at any time attempted to direct Baron as to how or who washed the windows, the material or equipment that he should use; that nothing was said as to when he should do the work. Defendant's vice president says he believes he never told Baron one thing or another about washing the windows. "No one else was employed to wash the windows besides Joe Baron, or someone he might select." The Beno Company's employees used a time-recording system. Baron was never on the pay roll. He rendered statements monthly, on the following form:

"John Beno Co.
        to National Window Cleaning Co., Dr.
    "We are the Most Reliable Window Cleaners in the City.
"Phone 3866 W                              325 North 10th Street
    "For window cleaning service in Oct.              $12.00
    "Paid Natl. Window Cleaning Co.
    "Mar. 14, 1925."

    "Baron was paid like we paid all our other city bills."

It is without controversy that, by the agreement between defendants, Baron was to do this particular work of cleaning the windows. It was the result that was contracted for,—cleaning the windows,—and not Baron's personal services. Baron was left to his own means and to his own time of doing the work, except that he was to wash the windows either semiweekly or bimonthly,—whenever they needed it. Defendant company had no control over Baron, either as to his time, his equipment, or his method of doing the work. His business was not that of a servant, to do the work which he might be directed by a master to do, but to clean the windows. He had an established business of cleaning windows for anyone who would employ him. Plaintiff relies upon the use by defendant's witnesses of such terms as that Baron was paid for his services, "and that Baron worked at defendant company's place." Washing windows was "work," and was "services." A party to a contract does not become a servant because he contracts to perform a particular service, to produce a certain or satisfactory result, or because he agrees to make his work satisfactory, or in accord with specifications, or because his contract may be terminated if he fails to furnish what he contracts to furnish. Baron was an independent contractor, and for his negligence defendant company was not responsible. *In re Estate of Amond*, 203 Iowa 306; *Smith v. Marshall Ice Co.*, 204 Iowa 1348; *Franks v. Carpenter*, 192 Iowa 1398; *Pace v. Appanoose County*, 184 Iowa 498.—*Affirmed.*

STEVENS, C. J., and DE GRAFF, ALBERT, and WAGNER, JJ., concur.