IRENE RODEFER, Administratrix, Appellant, v. CLINTON TURNER AND BENEVOLENT VEREIN VORWAERTS, Appellee.

No. 46125.

OCTOBER 27, 1942.

M. L. Sutton, of Clinton, for appellant.

E. L. Miller and Glenn T. Cousins, both of Clinton, for appellee.

STIGER, J.— Appellant relied solely on the doctrine of res ipsa loquitur, her petition charging general negligence only. Decedent was last seen in the Midway Tavern between 11:30 and 12:30 o'clock on the night of April 30, 1940, and about 6:30 the next morning was found on the floor of an elevator shaft located on the appellee's premises, in an unconscious condition. He died before recovering consciousness.

Appellee owned two buildings in Clinton, Iowa, situated at the southeast corner of Fourth Avenue South and South Second Street. The Turner Building, a four-story brick structure, fronts west on South Second Street—a north-and-south street. The Turner Annex, a two-story building, is situated east of the Turner Building, facing north on Fourth Avenue South. Between the two buildings is an areaway extending south from Fourth Avenue a distance of about 75 feet to a wall at the south end of the Turner Building. The corridor then turns east at right angles between the rear of the annex and said wall about 50 feet to a dead end. At the north entrance, for a distance of-42 feet south the corridor is 7 feet wide, and for the remaining distance south it is 10 feet wide. The east-and-west way of this L-shaped passage is 12 feet 3 inches wide.

The freight elevator adjoins the south wall of the east-and-west corridor and is located about 13 feet east of the west side of the north-and-south way. It is 6 feet 10 inches wide and 9 feet 4 inches long, there being a clear space of about 5 feet 6 inches between the elevator and the north side of the way. The bottom of the shaft opens into a tunnel leading into the basement of the Turner Building.

The first floors of the two buildings are occupied by tenants. The rear of the stores of the Turner Building face the north-and-south corridor. The Midway Tavern and Alden's Cafe are in the Turner Building. The rear door of the Midway Tavern opens on the north-and-south corridor about 25 feet south of the entrance to the way on Fourth Avenue South. The rear door of the Alden Cafe is about 32 feet south of the entrance and the rear door of a barber shop opens on the south

end of the way. Baumeister's Tavern is in the annex building and its rear door opens on the east part of the east-and-west areaway, about 12 feet from the dead end, and is about 28 feet east of the elevator. There were no lights in the east-and-west corridor, and the only light in the north-and-south way was a small electric bulb in the rear of the Alden Cafe about 25 feet north of the elevator.

The cement floor of the elevator shaft is 7 feet below the level of the corridor. When Mr. Rodefer was found in the center of the floor of the shaft the elevator doors, which opened to the west, were open, and the elevator was at the second floor.

Appellant's theory is that decedent left the rear door of the Midway Tavern about midnight and walked south about 40 feet to the east-and-west way, turned east, and, instead of passing down the east-and-west corridor north of the elevator, walked through the open doors and fell to the bottom of the pit, sustaining the injuries that resulted in his death. There were no guards around the elevator and there were no handles on the inside or outside of the elevator doors. The function of this elevator is described by appellee's janitor, a witness for appellant, as follows:

"Q. Are you acquainted with the elevator shaft which is located in an areaway behind the Turner Building? A. Partly, yes. I never had much to do with it, but I know how she is situated and about it. Q. Well, what purpose does it serve there? A. Well, mostly for freight. Q. Where does the freight come from and where does it go to? A. Well, May Alden has freight going down into the basement for her stuff and—Q. Well, where does the freight come from and where does it go to? A. Well, it's stuff that we get upstairs, like beer and soft drinks, and we pull it up. Q. Beer and soft drinks up to the Turner Society? A. On the third floor, yes."

The Midway Tavern, located about 25 feet south of the north entrance to the corridor, maintains a neon sign on the Turner Building at the north entrance, with an arrow pointing south. Appellant's evidence shows that during intermissions and after dances at the Modernistic Dance Hall, which is apparently east of the annex, patrons of the hall would go down the corridor

and enter the Midway Tavern and Alden's Cafe for refreshments, through the rear doors instead of using the front entrances on South Second Street. Evidence that patrons of the dance hall might proceed south of the Midway Tavern and cafe at night and walk east down the unlighted east-and-west corridor 38 feet to Baumeister's Tavern is unsatisfactory and unconvincing. Patrons desiring to go from the dance hall to Baumeister's Tavern would naturally enter the front door on Fourth Avenue rather than to walk west of Baumeister's Tavern to the corridor and through the entire corridor to its rear door. The most that can be said of the use of the east-and-west corridor by patrons of the dance hall or others that night is that it was very rarely used.

I. Appellant's first assignment of error is that the court erred in sustaining appellee's motion for a directed verdict because the questions of appellee's negligence and the proximate cause of decedent's injuries were for the jury. Appellant alleged in her petition that the falling of decedent into the shaft was the direct result of the negligent operation and maintenance of the passageway "and the elevator shaft and the openings thereto, then under the exclusive control and management of the defendant."

Appellee's answer admitted that "there is and was a freight elevator and shaft, owned and controlled by defendant, located at the south side of that part of said passageway or areaway extending east and west at the rear of the storerooms fronting on Fourth Avenue South."

Appellee's answer must be construed as an admission that it was in complete, exclusive control of the elevator.

"The necessity of complete and exclusive control of the instrumentality, for the application of the res ipsa loquitur rule, has been repeatedly referred to by the court." Whetstine v. Moravec, 228 Iowa 352, 368, 291 N. W. 425, 433.

The elevator was at the second floor and the doors opened directly into the pit when Mr. Rodefer was found in the center of the floor "facing the south, sort of on his side, lying in that [a drawn-up] position." There were no guardrails at the entrance to the elevator. One witness testified the elevator doors

were never locked but the doors were always closed "so far as I know." There was testimony that they were open part of the time.

The circumstances were sufficient to generate a presumption of negligence, that the accident happened through want of care on the part· of appellee. No evidence was introduced by appellee to rebut the presumption arising from the circumstances.

Appellant's position is that, based on the evidence, the most likely explanation of the accident is that Mr. Rodefer was last seen in the Midway Tavern about 12:30 a. m. on May 1, 1940, and said that he was going to get something to eat, probably at Mae Alden's restaurant; that he left the Midway Tavern or the restaurant about 12:30 and turned to his right into the north-and-south portion of the corridor, and as he reached the south part of the north-and-south way he turned east to go down to Baumeister's Tavern, the rear door of which was near the east end of the way. The doors of the shaft were open to the west and he needed only to take one stride to the south before turning east and he would walk into the open shaft. The area-way at this point was dimly lighted by a small light in back of Mae Alden's restaurant.

The following evidence tends to sustain appellant's theory that decedent fell into the pit soon after he left the Midway Tavern about 12:30:

"He was unconscious. Well, it was quite cold that morning and he apparently was chilled or cold and he showed evidence that he had laid there for some time in this position or in the bottom of the pit. His skin looked sort of purple, or like a person would who had lain out in the cold for some time."

On .the question of proximate cause, appellant claims the circumstances surrounding the case make her theory more than a possibility, that they render her theory more probable than that the fall happened from some other cause, and the issue of proximate cause was for the jury.

Appellee claims there ·are several theories as reasonably probable as appellant's hypothesis.

Decedent suffered a skull fracture which extended from the right temple to the base of the brain, a resulting cerebral hemorrhage causing his death.

A physician and surgeon was asked whether there was an outward indication of where the blow might have been that caused the skull fracture. He replied that there was an abrasion approximately three fourths of an inch or an inch in diameter over the right area back of the ear—just back of the mastoid of the right ear. Appellee claims the falling into the pit could not possibly have caused such an injury, but there is no medical or other evidence to sustain this claim. It will be recalled that decedent was lying on his right side when found.

Appellee also asserts:

"1. He could have opened the doors himself and stepped in,

"2. He could have been thrown in while unconscious,

"3. He could have been pushed in,

"4. He could have been dragged in from the cellar under the building through the passageway which is on a level with the bottom of the pit,

"5. He could have walked in from the cellar in a semiconscious state and fallen there without falling from the areaway level."

There is no evidence of foul play. Decedent's watch and billfold containing $60 were in his pockets when he was found in the shaft. He had a good disposition and was not quarrelsome. He was in good health and normal when he left the Midway Tavern.

We are of the opinion appellant's theory is a reasonable inference from all the circumstances and more probable than the theories advanced by appellee. In Boles v. Hotel Maytag Co., 218 Iowa 306, 310, 253 N. W. 515, 517, it is said:

"But if the circumstances supporting a theory of negligence are of greater weight than the evidence supporting the theory of no negligence, then it becomes a question of fact for the jury to determine whether or not the cause of the injury was the negligence alleged. A person is not required to prove his theory

of negligence by testimony so clear as to exclude every other possible theory.''

In Tisher v. Union P. R. Co., 173 Iowa 567, 570, 155 N. W. 975, 976, we stated:

''The causal connection between the injury and the negligence of the defendant may be proved by direct or circumstantial evidence. If the latter, it must be something more than consistent with plaintiff's theory of how the accident occurred. It must be such as to make that theory reasonably probable, not merely possible, and more probable than any other hypothesis based on such evidence.''

For a recent comprehensive consideration of the doctrine of res ipsa loquitur, see opinion by Bliss, J., in Whetstine .v. Moravec, 228 Iowa 352, 291 N. W. 425.

■ II. Appellee contends that decedent was at most a licensee at the place where he received his injuries, and it owed him no duty other than to not wantonly or willfully cause him an injury, and with this position we agree. In Wilson v. Goodrich, 218 Iowa 462, 467, 252 N. W. 142, 144, the court, speaking through Anderson, J., said:

''An invitee to a place of business is one who goes there, either at the express or implied invitation of the owner or occupant, on business of mutual interest to both, or in connection with the business of the owner; while a licensee is one who goes on the property of another, either by express invitation, or with implied acquiescence, solely in pursuit or furtherance of business, pleasure, or convenience of the licensee.''

All of the stores adjacent to the areaway were occupied by tenants. Exhibit D is a view of the north-and-south corridor, showing the fire escape, the small light at the back door of the Alden Cafe and the general nature of the areaway.

It is apparent this private corridor was not built or maintained for use by the general public as a means of ingress or egress to the business properties abutting thereon and it was not so used by the general public. It does not appear decedent was in the corridor on any business with or for the benefit of appellee, or that he was induced to use the corridor by any conduct of

appellee. So far as shown by this record, he was using the corridor for his personal convenience and advantage or for a purpose unrelated to appellee. It is appellant's own contention that decedent was on his way through this unlighted corridor to Baumeister's Tavern.

We hold that decedent was a mere licensee and appellee owed him no duty to keep the corridor in a reasonably safe condition. That appellee may have passively acquiesced in the use of the corridor did not give decedent the status of an invitee. There is no evidence of a willful or wanton injury.

"Sec. 105. Condition of Premises.—No duty is imposed by law on an owner or occupant to keep his premises in a safe condition for those who come there solely for their own convenience or pleasure, and who are not either expressly invited to enter or induced to come thereon, although their entry is permitted by the owner or occupant." 38 Am. Jur. 767, section 105.

"Applying the general rule to elevators, it may be said that the owner or operator of such an instrumentality is under no obligation to mere licensees coming near or riding thereon ex-

cept to refrain from wilful or wanton injury." 18 Am. Jur. 543, section 36.

In Printy v. Reimbold, 200 Iowa 541, 546, 202 N. W. 122, 124, 205 N. W. 211, 41 A. L. R. 1423, the court said:

"It is the universal rule that persons entering voluntarily upon the premises of another, out of idle curiosity or for their own pleasure or advantage, take the same as they find them, and the owner or occupier thereof is bound only to avoid wanton or willful injury to them; but, if the purpose of going upon the premises is the common interest, or for the mutual advantage of the parties, an implied invitation, which makes it the duty of the owner or occupier to maintain the same in a reasonably safe condition, may be inferred."

In Keeran v. Spurgeon Merc. Co., 194 Iowa 1240, 1242, 191 N. W. 99, 100, 27 A. L. R. 579, we said:

"If one goes upon premises without invitation, express or implied, the owner or occupant thereof is under no duty to look out for his safety; and if he be injured through the negligence of the owner or occupant while there without lawful right, or as a bare licensee, no recovery can be had."

We might add that it does not appear that decedent was an invitee of the Midway Tavern. There is no evidence he was in the tavern as a patron.

Mr. Wasen, the proprietor of the tavern, testified, in substance:

"I saw Harold Rodefer in my place of business about 11:00 or 12:00 o'clock on the night of April 30, 1940. I do not know where he went from my place of business. He said he was going over to eat. The Mae Alden Restaurant is the second door south of my place."

There is no evidence that decedent was in the Alden Cafe. It is unnecessary for us to consider the question of decedent's contributory negligence.—Affirmed.

WENNERSTRUM, C. J., and SAGER, GARFIELD, HALE, BLISS, and MITCHELL, JJ., concur.