Anne E. Pierce, Appellee, v. Merle F. Gruben et al.,
Appellants.

No. 46750.

March 5, 1946.

R. Eldon Laird, of Waverly, for appellants.

Swisher, Cohrt & Gilliland, of Waterloo, and Oliver J. Reeve, of Waverly, for appellee.

BLISS, C. J.—Plaintiff's petition was in two counts. Count one contained nine separate grounds of negligence, some of which were specific in their designation of the negligence, and some of the grounds were merely general allegations of negligence. However, in submitting count one to the jury the court eliminated all specific grounds of negligence and submitted the count, in substance, as follows: Under an oral contract defendants agreed to erect a tombstone upon the cemetery lot of her parents, and did so, and when plaintiff placed her hand on it while inspecting it the stone fell upon her and she was injured, as a result of the defendants' negligence in the following particulars:

" 1. In failing to use due care, skill and workmanship in the original setting of said stone.

"2. In failing to use proper care, skill and workmanship in repairing and resetting said stone."

Count two of the petition was submitted by the court, in substance, as follows: After the tombstone was erected it became loose from its foundation, and this fact was called to the attention of defendants on June 30, 1941, and defendants then agreed to repair and reset said stone immediately; that between said date and September 12, 1941, the defendants did so undertake and did repair and reset said stone: "that the plaintiff possessed no knowledge as to the skill or care required in the repair and resetting of said stone but relied wholly upon the knowledge, skill and experience of the defendants; that the defendants reset said stone in such a careless and negligent manner that it fell upon the plaintiff when she placed her hand upon the same while inspecting it during a visit to the grave of her parents on or about September 12, 1941, thereby causing the injuries * * *."

In the submission of each count the court set out the

items of damages and the amount claimed on each in the total amount of $15,000.

For answer the defendants admitted that plaintiff was injured by the tombstone falling upon her, but denied that she was injured in the manner alleged, and denied generally all other allegations of counts one and two. Defendants also alleged that plaintiff, knowing the state of repair of the tombstone on September 12, 1941, and appreciating the danger, in placing herself in such proximity thereto and pushing the same voluntarily, assumed the risk of the conditions and the negligence of defendants.

█ I. Plaintiff moved to strike the allegations in the answer pleading assumption of risk. The motion was overruled. However, the court failed to submit this pleaded issue to the jury. There was ample testimony tending to sustain this allegation and it was error for the court not to submit it, but in view of our disposal of the case the error is of no consequence and will not be further discussed.

█ II. While the allegations in both counts one and two are all general allegations, and ground two of count one is in substance and effect the same as the general ground alleged in count two, the court, by instruction 7, makes the rule of res ipsa loquitur apply only to count two.

The court submitted to the jury three forms of verdict and instructed them to use the one which conformed to their finding. The first form was for their finding on count one of the petition; the second form was for their finding on count two; and form three was to be used if they found for the defendants. The jury found nothing for the plaintiff on count one of the petition but found damages for the plaintiff in the sum of $3,000 on count two.

In instruction 11 the jury were told by the court that they could not find for plaintiff on both counts one and two of the petition as shown in instructions 1 and 2.

The jury was right in finding the plaintiff was not entitled to recover any damages under count one as there was no evidence whatsoever of any negligence on the part of the defendants in the setting of the stone in October 1935. Neither was there any evidence to support a recovery under ground

two of count one. Division I of defendants' motion to direct a verdict in their behalf on count one should have been sustained and the court erred in not doing so.

III. In Division II of defendants' motion to direct a verdict in their behalf they alleged as grounds therefor that plaintiff had failed to sustain the cause of action alleged in count two because, first, the evidence was insufficient to establish that defendants had repaired or reset the monument as alleged in said count two, and second, the plaintiff had wholly failed to prove that defendants had the exclusive management and control of the monument or the fall thereof at the time of her injury on September 12, 1941, and wholly failed to establish by competent evidence the facts necessary for the application of the rule of res ipsa loquitur relied upon in said count two.

With respect to the repairing and resetting of the stone as alleged in count two of the petition, the defendants alleged, and supported the allegation with evidence, that they had never repaired or reset the stone prior to the injury, because after a careful examination of the stone in the latter part of August 1941, they had found it sitting perfectly erect, plumb, and firm upon its foundation, and wholly without need of repair or resetting.

As these defenses in the answer are largely factual it is necessary to set out sufficient of the relevant and material evidence bearing upon those issues. As noted above, the allegation of negligence in count one respecting the original setting of the stone was merely a general allegation that defendants were negligent in that matter. There was no evidence in support of it, while opposed to it there was testimony from both sides, given by expert witnesses of long experience in the erection of monuments in cemeteries, that the Pierce stone was erected and set with due and proper care, skill, and workmanship, in accord with the best practices and generally used methods in that line of work. There was no controversy on the issue. We will give no further attention to the original setting of the stone except as the evidence respecting it may bear upon count two and defendants' answer thereto. The circumstances and conditions existing prior to the alleged re-

setting are so connected with the latter issue and with the defenses, and with the plaintiff's relation to the monument transaction as a whole, that reference to the earlier matters is necessary.

The stone was a granite slab twenty-six inches wide at the base and eight inches thick. It gradually narrowed and was about twenty-one inches wide at the top, which was rounded somewhat, and was thirty-four and one-half inches high at the highest point. It weighed between seven hundred twenty and seven hundred fifty pounds. The cemetery in which it stood was owned by the city of Waverly. The city constructed the cement foundation for the stone, as it did for all tombstones erected in the cemetery. There was no defect in the foundation. Its upper surface was level and smooth. Its dimensions were but slightly in excess of those of the base of the stone. The upper surface of the foundation was about level with or just below the surface of the ground about it. The foundation was constructed September 30, 1935, and the stone was erected early in October following. The defendant, Merle F. Gruben, who had over twenty years' experience in the setting of monuments in cemeteries, erected this one. Plaintiff conceded that good materials were used in setting the stone upon the foundation and making the cement joint which sealed them together. The stone was then plumbed and leveled and the cement joint was pointed and formed a complete seal around the outside edges of the space between the stone and the foundation. The cement would completely set in about six hours and would reach its maximum tensile strength in about twenty-eight days. Mr. Gruben testified that when he completed the erection and the setting of the stone it stood on a good bed of cement, perfectly upright, level, firm and solid on its foundation. The defendants' contract was then completely performed. There was never any arrangement or contract between the defendants and the plaintiff or her family that defendants were to have any supervision, care, or control over the stone after its erection. Neither is there any evidence that they did any of these things. Merle F. Gruben testified that the defendants did no work on or about the stone from the time they erected it until, at the re-

quest of the city, they set up the stone after it fell upon plaintiff.

There was corroboration of the testimony of Gruben with respect to the way in which he testified that he had erected the stone. Mr. Lane, the superintendent of the cemetery, had been engaged in cemetery work all of his life. He had been superintendent of this cemetery since 1927. He had general supervision of all work in the cemetery, superintending all burials and the construction of all foundations for monuments. He had knowledge of the methods and manner of setting monuments and had much experience in that work. He was familiar with the Pierce lot and tombstone. He had occasion many times in recent years to observe the Pierce stone prior to September 12, 1941. It was in a plumb, upright position and solid on its foundation at all times so far as he observed. He saw all monuments in the cemetery every few days, and there were approximately thirty-five hundred of them in the cemetery in 1941. It was open to the public at all times. He arranged for the burial of plaintiff's mother in December 1938. Her grave was dug within six inches of the stone of which complaint is made in this action. Some of the workmen had their hands on the stone. Lane had his hands on it and it was not loose and did not move or wobble. Had it done so it very likely would have been observed by the superintendent and these caretakers whose duty it was to inspect and keep in repair this lot under a contract for perpetual care thereof entered into by the cemetery authorities and the plaintiff and her sister. The plaintiff and her sister were there at that time. Lane had tested this stone shortly after it was installed and saw nothing wrong with it. Two caretakers employed by the city to mow the cemetery lots and hand-clip the grass around the bases of the stones which the mower could not cut, and thus came in physical contact with the stones, were witnesses. One of these men, Mr. Mooney, a caretaker for ten years, testified:

"I have observed the Pierce monument pretty near every day when I am there since its original erection in 1935. I have seen the stone on frequent occasions every year. I saw the stone during the summer of the year 1941. I did not at

any time prior to the accident on September 12, 1941, observe the Pierce monument to be leaning or tipping or tilting or out of plumb * * *. On all occasions when I observed it its position relative to being level and upright looked all right to me. I mean it appeared to be level and upright and that is true of every occasion I saw it except the time of the accident.''

This witness was at his work the forenoon of the accident. He called the defendants' office to send someone to reset the monument. He was experienced in mixing cement and applying it. He saw the stone as it lay face down and observed the base of the stone and the upper surface of the foundation and saw where the cement joint between the stone and the foundation had been broken, with part of the cement joint adhering to the base of the stone and the remainder adhering to the foundation. He observed that the cement mortar had a proper content of sand and cement. It was rich in cement and formed a close, tight seal. He assisted Mr. Johnston, an experienced monument man, who reset the stone. He observed the foundation and noted by his eye and by instrument that it was level and in good condition. The cement adhering to the stone and the foundation was not disintegrated nor crumbly, but was hard and of good strength and mixture, so that it was necessary to chip it off by blows with a trowel. The adhering cement showed that there had been a complete joint all the way around when it was originally set and before it was broken by the fall. This was the testimony also of Johnston, who reset the stone after September 12, 1941.

Mr. Weber, a caretaker at this cemetery for forty years, testified that he had observed the Pierce stone in doing his work and never saw anything wrong with it. He was present immediately after plaintiff was injured and saw the condition of the stone, the foundation, and the cement. He spoke of the difficulty of removing the cement. He was present when Johnston reset the stone and corroborated both him and Mooney in their testimony.

There was testimony of expert monument men, for each side, that the freezing of water and moisture and the thawing

of ice and snow and the ground around the stone, and other action of the elements and the forces of nature, would loosen or break cement joints that were properly made when the monuments were set. This was particularly possible if the stone was set where it was exposed to the action of flowing water from rain and thaws. The Pierce lot was on a terrace on a hillside and was lower than the ground above it. There was no controversy among these experienced experts that the action of these forces of nature would disturb monuments and impair the sealing joints.

There was no evidence that there was anything omitted or done by the defendants in the original setting of the stone. Witnesses who examined the cement foundation and the base of the monument as late as the time of the trial found them both level and free from any conditions or defects that would cause the stone to rock, tilt, or wobble. There was no evidence to the contrary. Every witness on either side, including the plaintiff, testified that at all times the stone as it stood upon its foundation in the cemetery was straight, upright, even, and level, and apparently firm and solid. That was its appearance as the plaintiff walked up to it and took hold of it with her hands on September 12, 1941. A duplicate of the Pierce stone was set up on the level floor of the courtroom without a cement joint or support of any kind and it required a pressure force of sixty pounds to tilt it so that it would overbalance and fall. Similar experiments conducted with the Pierce monument, sitting on its foundation in the cemetery, with the cement seal broken, showed that it required a pressure of sixty pounds to cause it to fall. An expert witness for plaintiff testified that in order for this monument to be easily tipped the side of the base on which the pressure was exerted would have to be raised so that the base made an angle with the foundation of ten or twelve degrees; that is, the stone would have to be already leaning ten or twelve degrees before the pressure was exerted. Such a tilt would be observable to anyone looking at the stone. He said that if the stone were tilted at an angle requiring only the touch or pressure of laying on the hands the wind would knock it over. Several witnesses were present when the tests were made in

the cemetery. Other tests were made in the courtroom. At some of these tests it was found that when the stone was tilted so that it would overbalance on a pressure of five pounds, a two-by-four-inch timber could be slipped under the back side of the stone, and when it was raised an inch it required thirty pounds' pressure to overbalance it. These tests were made in the presence of representatives of both sides.

During the years intervening between the placing of the stone in the cemetery and the summer of 1941, two or three instances occurred when the stone was tipped, according to the plaintiff. The only persons testifying to these occurrences were the plaintiff, her sister, and a lady cousin. A gentleman cousin did the tipping on one occasion. He was not a witness. The lady cousin testified that in September 1936, she had taken hold of the stone and tipped it. And in June 1938, she testified that her seven-year-old grandson was with them, and:

"* * * the first thing we knew he could tip the stone. He touched the monument on that occasion. I saw the top of it move. * * * At that time he must have been about three and a half feet tall. He was frail; he wasn't a rugged child. I suppose he weighed around forty-five pounds. * * * He was standing on the west side at the face of the monument. He placed his hands up toward the top. I saw the monument move as a result of the pressure he exerted. * * * When the monument was tilted or moved as I testified, it came back to an upright position of its own accord. * * * He tipped it about a half inch or so. You couldn't move it at all unless the entire thing moved. It just moved so it would raise a half an inch, you could see the space under the monument. * * * Before he moved it the monument was straight up and down."

On June 30, 1941, this witness and her brother visited the monument. She testified, "on that occasion he was the one who tipped it." Plaintiff, fifty-six years old, and her elder spinster sister were present on this occasion.

Plaintiff was at the grave six times after the stone was set. In the spring of 1936, although she had "heard at the time that the stone was insecure, I didn't examine it very

much; the appearance seemed to be good." But she testified that she informed the elder Gruben, who died in 1938, of the report. She and her sister and mother visited the lot in September 1936, and although they made no examination of the stone, she testified they again told one of the Gruben boys that the stone had been reported to be insecure. She was at the lot on December 8, 1938, when her mother was buried, but did not examine the stone. Apparently satisfied with the services of the defendants, plaintiff and her sister purchased a headstone for their mother's grave which matched the one at their father's grave. Plaintiff testified:

"In May 1939 I came to see the headstone installed at my mother's grave. On that occasion I didn't test the monument itself. I didn't check to see whether it was loose on that occasion."

At this time they talked with one of the Gruben boys. It is very strange, and it is in no way explained, that on this occasion, three years after they were first informed that the monument was insecure, of which she testified she had reported to Grubens, when they were at the cemetery lot and the defendants were there setting a headstone on their mother's grave six inches away from their father's grave, something was not said to the defendants about the father's headstone and some examination was not made of it, and it was not then reset while they were there equipped to do it, if the monument was in the wobbly, teetering, insecure, and dangerous condition claimed by the plaintiff. But none of these things was done.

The next occasion was on June 30, 1941, when the testimony was that Cousin Jackson tipped it. She testified that she reported the matter to one of the Grubens and he assured her that he would attend to it.

Merle Gruben testified that in June or July 1941, plaintiff told him that the stone appeared to be loose and asked him if he would inspect it and fix it if it needed any attention. He told her that he would, and that:

"Later on in the summer in August I instructed Mr. Johnston that worked for us to go down and inspect the Pierce

monument and if it needed any repair to go ahead and repair same. Mr. Johnston went to the cemetery to make the check up. He did not talk with me upon his return from the cemetery. I don't believe I ever had another conversation with Mr. Johnston regarding the Pierce monument until just recently. * * * He is not employed by our firm now. He left our employ in the fall of 1941, I believe, either 1941 or 1942. He went to the Martin Bomber Plant."

Mr. Johnston testified that in the latter part of August 1941, he went to the cemetery and Mr. Lane, the superintendent, took him to the Pierce lot, and that he examined the monument thoroughly and could find nothing wrong with it. It was level and solid on its base and was plumb perpendicularly. He took a brush and brushed the dirt and grass from the joint between the monument and the base and found the joint intact and in place all around. He then applied pressure to the monument and found it firm and solid. He said that Mr. Lane examined the monument and tested it with his hands and there was no movement. Mr. Johnston did not reset the monument. Mr. Lane, as a witness, fully corroborated Johnston. He said that he found the joint to be perfect. Johnston testified that since he had done nothing to the monument except to examine its condition, and since he found it needed no repairing of any kind, he made no report to the office of any charge for service and did not talk to either of the Grubens about the matter at any time thereafter until sometime before the trial. Merle Gruben was not at the plant when Johnston returned. Johnston was a trusted employee. Speaking of him and other employees, he testified:

"They don't report back to me in any manner. They have been there long enough so I feel that I can depend on them."

On the day of the accident, September 12, 1941, the plaintiff and her sister drove in a car to the cemetery and stopped in the roadway adjoining their lot on the south. Plaintiff got out of the car "to check this stone to see if the Grubens had set it." She testified:

"I gave a little pressure and it moved. I said to my sister, they have not set this stone, and at that it moved and came over on me. * * * When I took hold of the stone I was looking first at the stone then I looked up at the car at her. As I recall I looked up at her and said this and all of a sudden I felt that stone pushing against me and I tried then to get away from it. * * * On September 12, 1941, I had no definite knowledge that the monument had been reset by the Grubens prior to that date except that they told me June 30th it would be reset. No one told me or informed me after that that it actually had been reset. * * * Q. You were then making an intentional test, were you, of the monument, you intended to test the monument at that time? A. I think, Mr. Laird, I would say maybe check but not test because I was going over there, just put my hands on it and had no idea of using pressure enough to move the stone. * * * Q. Now on that occasion when you placed your hands on the monument did you intend to test it to see whether it would rock or tip? A. I intended to put my hands there to see if it would move in response to a slight motion as it had before. * * * Q. You intended to see though for yourself? A. Yes. * * * [Redirect examination.] Q. When you called to your sister, 'I don't believe they have fixed this stone,' when was that remark made, Miss Pierce? A. As I recall, Mr. Cohrt, it was just after I felt the movement of the stone and there was a natural surprise that there was a movement under my hands by the stone and I looked up at her and made that remark. Q. Was there any observation on your part other than the movement of the stone that prompted that remark? A. No the stone looked perfectly all right as I came toward it. Q. Was it in an upright position when you came toward it? A. Oh yes. Q. Did it give any evidences of tilting as you came toward it? A. No, sir."

The plaintiff's sister was with her at all times when they visited the cemetery lot but she never attempted to tip the stone. Of the occasion in June 1941, when her cousin, Mr. Jackson, "tipped" the stone, she testified:

"As I remember it Mr. Jackson exerted a slight pressure and it moved a little. I saw the monument move when he did that. It kind of went this way just a little. I should say it made an arc perhaps of a few degrees, that is enough that anyone could observe the movement. After he left hold of it it was upright."

Of the occurrence on September 12, 1941, she testified:

"I noticed the stone as my sister approached. It was perfectly upright just as that stone [Exhibit 1] stands there. I was watching her as she placed her hands on the stone * * * and very quickly called out words to this effect, I don't believe they could have fixed the stone and at that I saw the stone coming toward her and she fell to the ground."

The plaintiff on this occasion saw nothing in the appearance of the stone to indicate that it had ever been reset. She was certain that it had not been reset. When her sister wrote to the defendants on September 14, 1941, she referred to the fact that they had assured her in June of that year that they would attend to the matter, and then stated in the letter: "We were in Waverly last Friday (Sep. 12th) and found you had not done so."

It was in response to this letter that Merle F. Gruben, on behalf of his firm, on September 18, 1941, wrote the following letter to the sister, to wit:

"Dear Miss Pierce:

Your letter received. We are very sorry to learn of your sister's accident and we sincerely hope that the injury was minor and that your sister will soon recover.

Your memorial was reset several weeks ago in the usual manner in which all memorials of this type are set and with this type of setting this memorial will never fall over in hundreds of years unless pushed or pulled over.

You must realize that there is not a monument in any cemetery but what can be tipped over providing enough pressure is exerted.

We have again reset your memorial and if this time,

the cement is left to set for several weeks without being molested so that the cement will have ample time to knit to the stone, same will stand for years providing same is not pushed over by some one.

As far as your statement of we being guilty of gross negligence, our responsibility ends with the completion of the stone set in the cemetery and we are not responsible for stones being pushed over.

Yours sincerely,"

This letter is the only evidence that the monument was reset prior to the accident on September 12th. Merle Gruben stated therein that it had been reset some weeks before. He assumed that plaintiff had pulled the stone upon herself by tampering with it before the cement had become thoroughly set. This is apparent from the statement therein that, "we have *again* reset your memorial and if *this time,* the cement is left to set for several weeks *without being molested* so that the cement will have ample time to knit to the stone, same will stand for years providing same is not pushed over by some one." The statement that the stone had been reset some weeks earlier was written because of a misapprehension of the facts. Plaintiff had complained to him in June that the stone was loose, not tight, or wobbly. He assumed this was true and assured them that he would have it examined and any necessary repairs would be made. He instructed Mr. Johnston to attend to the matter. He assumed that his instructions had been carried out. It had not been his practice to have trusted and experienced employees report personally to him the performance of his instructions. After the accident came to the attention of the defendants they were perhaps careless in not investigating further and ascertaining whether the stone had been reset, but they did not. This failure, however, does not establish as a fact that which was not a fact. An admission, like a waiver, to be binding must be made with a knowledge and an appreciation of the facts. An inadvertent statement thoughtlessly or carelessly made, without information or investigation, ought not be given the binding force of an admission, where no element of estoppel exists. Johnston left

the employment of defendants long before the commencement of this action. Defendants first learned that the stone had not been reset from Lane, the superintendent of the cemetery, sometime in 1943. It was after this that defendants communicated by letter with Johnston and received confirmation of what Lane had told them. There is not the slightest evidence that Johnston reset the stone between June 30th and September 12, 1941, other than the erroneous and inadvertent statement in the letter. There were employees about the cemetery who often assisted in the erection of monuments. Had the stone been reset some of them would probably have had knowledge of the resetting. The able attorneys for plaintiff no doubt sought for such testimony but they produced none. Johnston and Lane, who are in no way impeached, testified that the stone was not reset when Johnston came out to examine it. Their testimony must be disregarded as perjury to sustain a submission of this issue to the jury and its finding thereon. The witnesses were not mistaken. There is the testimony of Johnston that the cement which he removed from the foundation and from the base of the monument after the accident was not green, nonaged cement, not fully set and but recently laid, but it was hard, stony cement mortar that had to be chipped off. The cemetery helpers, Weber and Mooney, saw this cement and saw Johnston hacking it off with his trowel. Mooney gathered up the pieces of the broken cement joint and threw them into the driveway. These men apparently were disinterested. Plaintiff had vouched for the veracity of Weber when she previously placed him on the witness stand.

It may be conceded that plaintiff had made a prima facie case on the issue of resetting the monument by the introduction of defendants' letter, which required them to go forward with testimony sufficient to overcome the prima facie showing. Certainly they did so go forward with direct testimony of conduct and conditions sustaining their contention, which the plaintiff in no way attempted to rebut. Plaintiff testified that when she placed her hands upon the monument to test it she turned and remarked to her sister that the Grubens had not reset it. Her sister, in the letter of September 14,

1941, said they found that the monument had not been reset. They had the stone under their observation and had ocular evidence to support their statements. These statements are adverse to their contentions in the action but no one contends that they are concluded by them. It was open to them to show the contrary. Likewise it was open to defendants to show that the statement in their letter was contrary to the fact.

The statement in the defendants' letter, on its face, and unexplained and unrefuted by other positive, believable testimony by credible witnesses, was sufficient to take the issue as to the fact of resetting the stone, alleged in count two, to the jury; but when testimony of the character just noted was offered that the so-called admission in the letter was inadvertent and given under a misapprehension of the facts, and based on no personal knowledge of the writer of the letter, and when testimony of like character is given that the stone was not in fact reset, and there is no other testimony to the contrary, it becomes very questionable whether the plaintiff has made a jury question on the issue of resetting the stone.

A similar case is Southern Express Co. v. Hill, 84 Ark. 368, 372, 105 S. W. 877, 878, where Hill based his suit on a receipt given him by the company stating that it had received from him a package marked ''J. W. Hill, Nashville, Arkansas,'' which was never delivered to him. The company did not deny the receipt but showed by witnesses who had seen the package that it was addressed to Hill at Nashville, Tennessee. In reversing a judgment for Hill, the court said:

''The receipt was only prima facie evidence that the box in controversy was marked Nashville, Arkansas. This evidence was contradicted by the testimony of all the witnesses who saw and remembered how the box was marked * * *. There is no conflict in the testimony of witnesses in this respect. The veracity of these witnesses is unimpeached. Their testimony is consistent and reasonable. * * * The evidence clearly shows that the statement in the receipt was a mistake. The evidence was sufficient to overcome the presumption or state-

ment in the receipt, and leaves the verdict of the jury unsupported by evidence.''

In Keith v. Guedry, Tex. Civ. App., 114 S. W. 392, 395, the court said:

''It does not necessarily follow, from the fact that the plaintiff has made out a prima facie case, that it must be submitted to the jury, for such a case may be so destroyed by the uncontradicted testimony of the defendant as to demonstrate beyond the peradventure of a doubt that the plaintiff has no case at all. In such event, it is made to appear as a matter of law that he is not entitled to recover, and it becomes the duty of the court to so instruct the jury.''

Referring to an inadvertent statement, the court, in Allen v. Armour & Co., 106 N. J. Law 554, 148 A. 605, said:

''We think the testimony must be considered as a whole. When so taken it is apparent that there was a mere slip of the tongue. This does not take a clear case to the jury.''

In a somewhat similar situation, the court, in Young v. Wilson, 24 Miss. 694, held that while the evidence adduced by plaintiff, unexplained or uncontradicted, was sufficient to establish the fact contended for by plaintiff, the subsequently offered evidence of the defendant, while not in conflict with that offered by the plaintiff but which in fact conceded and confirmed it, yet by the establishment of other facts so explained it as to deprive it of its probative value and demonstrated that plaintiff had no right to recover.

Numerous other decisions could be cited on this point.

But, without immediately deciding it, let it be conceded that the issue of whether the defendants reset the stone was for determination by the jury and proceed to the question of whether the plaintiff had established the facts essential for the application of the rule of res ipsa loquitur, which is the decisive issue.

. The basic principles of the rule are thus stated by Wigmore, in Volume 5, Second Edition, of Evidence, section 2509:

''What the final accepted shape of the rule will be can

hardly be predicted. But the following considerations ought to limit it: (1) The apparatus must be such that in the ordinary instance no injurious operation is to be expected unless from a careless construction, inspection, or user; (2) *Both inspection and user must have been at the time of the injury in the control of the party charged;* (3) *The injurious occurrence or condition must have happened irrespective of any voluntary action at the time by the party injured.* It may be added that the particular force and justice of the presumption, regarded as a rule throwing upon the party charged the duty of producing evidence, consists in the circumstance that the chief evidence of the true cause, whether culpable or innocent, is practically accessible to him but inaccessible to the injured person.''

This court has always consistently kept its application of the rule within the limits stated by the able author. A few of its later decisions are: Savery v. Kist, 234 Iowa 98, 103, 11 N. W. 2d 23; Whetstine v. Moravec, 228 Iowa 352, 365–370, 291 N. W. 425; Rodefer v. Clinton Turner Verein, 232 Iowa 691, 695, 6 N. W. 2d 17; Larrabee v. Des Moines Tent & Awning Co., 189 Iowa 319, 178 N. W. 373; Aita v. John Beno Co., 206 Iowa 1361, 222 N. W. 386, 61 A. L. R. 351; Peterson v. De Luxe Cab Co., 225 Iowa 809, 811, 812, 281 N. W. 737; Van Heukelom v. Black Hawk Hotels Corp., 222 Iowa 1033, 1043, 270 N. W. 16; Pearson v. Butts, 224 Iowa 376, 380, 276 N. W. 65; Welch v. Greenberg, 235 Iowa 159, 14 N. W. 2d 266; Whitmore v. Herrick, 205 Iowa 621, 218 N. W. 334; Eisentrager v. Great Northern R. Co., 178 Iowa 713, 722, 160 N. W. 311, L. R. A. 1917B, 1245; Work v. Des Moines Coliseum Co., Iowa, 207 N. W. 679; Boles v. Hotel Maytag Co., 221 Iowa 211, 265 N. W. 183; Orr v. Des Moines Electric Light Co., 207 Iowa 1149, 222 N. W. 560; Gianopulos v. Saunders System, C. R. Co., Iowa, 242 N. W. 53; Blackman v. Iowa Union Electric Co., 234 Iowa 859, 14 N. W. 2d 721; Harter v. Colfax Electric L. & P. Co., 124 Iowa 500, 100 N. W. 508; Sutcliffe v. Fort Dodge Gas & Electric Co., 218 Iowa 1386, 257 N. W. 406; Phillips. v. Briggs, 215 Iowa 461, 245 N. W. 720; Harvey v. Borg, 218 Iowa 1228, 257 N. W. 190; Crozier v. Hawkeye Stages, 209

Iowa 313, 228 N. W. 320; Olson v. Cushman, 224 Iowa 974, 276 N. W. 777.

Our decisions have uniformly stressed the necessity of the complete and exclusive control of the instrumentality in the party against whom it is sought to make the rule applicable. In this case, if it be conceded that the letter of defendants stated the fact of the matter—and there is no other evidence of the fact that it was reset—it was done sometime in July or August of 1941. After the completion of the work, which would be a matter of but a few hours at the most, the defendants had nothing more to do with the stone, and no further care, control, user, or supervision over it, and had no duty or obligation concerning it. It stood there in the cemetery under the control of the city of Waverly subject to such rights as the plaintiff and her sister had. On the 12th day of September 1941, they went to the cemetery lot and found the stone standing erect and level upon its foundation, just as it had since October 1935. None of the defendants was present. The plaintiff approached the stone of her own accord for the purpose of testing, or checking, as she preferred to say, the stability of the stone: ''I wanted to see if it was secure.'' In ascertaining this fact she placed both hands on and exerted sufficient pressure upon the stone to pull it onto herself. She must have stood in front of the stone, facing east and the lettering on the stone, and pulled it toward her; otherwise the stone would not have fallen on the inside of her left leg. But wherever she stood, and however and whatever force she exerted, it was sufficient to tip over the stone weighing over a third of a ton, standing flat on its foundation without leaning in any way. If her own version of the occurrence be accepted as true in every detail it proves conclusively that the rule of res ipsa loquitur has no application in this case. She at the time had sole and exclusive control and possession of the stone. She alone was the moving actor and force in its fall. If she had not done what she did the stone would have remained standing and she would not have been injured. She completely removed the third essential to the application of the rule, as stated by Wigmore, supra, to wit: ''The injurious occurrence or condition must

348

have happened irrespective of any voluntary action at the time by the party injured.'' The evidence also discloses that the defendants not only had no control or possession of the stone but it conclusively establishes that she had both. The record shows by testimony that is undisputed, and the truth of which is beyond any reasonable doubt, that as the stone stood on its foundation at the time the plaintiff placed her hands on it to try to move it she must have exerted a force of not less than sixty pounds.

It is our conclusion that, whether or not the stone was reset by the defendants, the plaintiff failed conclusively, and as a matter of law, to establish any negligence by the defendants or either of them which was the proximate cause of her injury.

We do not pass upon the issue of plaintiff's freedom from contributory negligence or other errors assigned by appellants.

It appears to the court that the application of Rule 349 of the Rules of Civil Procedure is proper and will best serve the ends of justice. The judgment is therefore reversed and the district court is directed to dismiss plaintiff's action at her costs.—Reversed with directions.

OLIVER, HALE, MILLER, WENNERSTRUM, SMITH, MULRONEY, and GARFIELD, JJ., concur.

MANTZ, J., dissents.