CENTRAL NATIONAL BANK & TRUST COMPANY, Administrator with will annexed, Appellant, v. LEDERER STRAUSS & COMPANY, INC., Appellee.

No. 46575.

MARCH 6, 1945.

J. R. McManus and Ralph N. Lynch, both of Des Moines, for appellant.

Carr, Cox, Evans & Riley, of Des Moines, for appellee.

GARFIELD, J.— ▇ Defendant owns a four-story brick building in Des Moines, at the southwest corner of the intersection of Court Avenue, which runs east and west, and Third Street, which runs north and south. Along the west wall of the building is a public alley paved with brick. Defendant occupied the second and third floors and the west part of the ground floor, but leased the fourth floor to the Packard Manufacturing Company, of which decedent was the secretary.

Attached to the west wall of the building was a steel fire escape. The lower eighteen feet of the escape was a counterbalanced stair, which, when not in use, was kept in a horizontal position at the second-floor level. The south or upper end of this stair was attached to the north end of the platform at the second-floor level. To the north or lower end of this stair was affixed a steel yoke to which was attached a wire-rope cable. The cable extended up over a pulley held by a bracket fastened to the wall above the north end of the stairway. Attached to the other end of the cable was a counterweight of some three hundred pounds, which kept the stairway suspended horizontally when not in use. When in use, the north end of the stair descended to the alley and the counterweight was elevated toward the bracket which held the pulley over which the cable ran.

About 5:20 p. m. on April 8, 1943, decedent's body was found about ten feet north of the lower end of the fire escape, which was then resting on the alley. He had a basal skull fracture, which caused death that same afternoon. The cable above referred to, broken about the middle, and the counterweight were lying in the alley eight to ten feet north of the bottom of the stairway. Between the stairs and the weight was the U-shaped steel yoke above referred to, which was about eight feet long.

One end of the weight, which was two to three feet long and ten inches thick, almost touched the building. Decedent's head was two and one-half or three feet from the wall and six or eight inches north of the weight. His body lay to the southwest. Part of the cable was over one arm. He was not on top of any of the cable. There were no eyewitnesses to the accident.

This action was brought by the bank as administrator. It claims that defendant negligently permitted some part of the fire-escape apparatus to fall upon decedent while he was lawfully in the alley. At the close of all the evidence there was a judgment for defendant on a directed verdict.

There is sufficient evidence that defendant, by its lack of ordinary care, permitted the cable to become defective, causing it to break, and, since plaintiff is entitled to the benefit of the no-eyewitness rule, that decedent was free from contributory negligence. However, defendant seeks to justify the directed verdict by the argument that there is insufficient evidence the apparatus fell upon decedent while he was using the alley. Defendant's theory is that decedent was injured while using the fire escape as a means of egress from the fourth floor of the building; in so doing he was a mere licensee to whom defendant owed no duty to exercise ordinary care.

If decedent used the fire escape as a means of egress from the quarters of the Packard Manufacturing Company on the fourth floor, he was a mere licensee (or, as frequently expressed, a "bare licensee") in so doing. There is no evidence that defendant expressly or impliedly invited such use of the fire escape nor that it was customarily so used. It was intended as an exit in case of danger from fire and not as a stairway generally. See, as sustaining our conclusion, Landers v. Brooks, 258 Mass. 1, 154 N. E. 265, 49 A. L. R. 562, and annotation 564; Aldworth v. F. W. Woolworth Co., 295 Mass. 344, 3 N. E. 2d 1008; Robinson v. Leighton, 122 Maine 309, 119 A. 809, 30 A. L. R. 1386, and annotation 1390, 1395; Smelser v. Deutsche Evangeliscke etc., Kirche, 88 Cal. App. 469, 263 P. 838; McAlpin v. Powell, 70 N. Y. 126, 26 Am. Rep. 555; 4 Shearman and Redfield on Negligence, Rev. Ed., 1779, section 777. See, also, Keeran v. Spurgeon Merc. Co., 194 Iowa 1240, 191 N. W. 99,

27 A. L. R. 579, and cases cited; Flaherty v. Nieman, 125 Iowa 546, 101 N. W. 280.

 If decedent was injured while using the fire escape as a mere licensee, defendant did not owe him the duty of exercising ordinary care to keep the apparatus in a reasonably safe condition but would be liable only for willful or wanton injury. See cases last above; also, Gillard v. Hoffman, 103 Kan. 572, 175 P. 395; Vondenberger v. Schaaf, 13 Ohio App. 285; Rodefer v. Clinton Turner Verein, 232 Iowa 691, 698, 699, 6 N. W. 2d 17, 21, 22; Mann v. Des Moines Ry. Co., 232 Iowa 1049, 1062, 7 N. W. 2d 45, 53, and cases cited; 4 Shearman and Redfield, Rev. Ed., 1793, 1794, section 781.

There can be no actionable negligence unless there is a duty to the injured party to exercise care. Williams v. Cohn, 201 Iowa 1121, 1122, 206 N. W. 823, and cases cited; 38 Am. Jur. 652, 653, section 12; 45 C. J. 639, section 16; 1 Shearman and Redfield, Rev. Ed., 10, section 4.

Defendant in effect concedes that it owed a duty to the members of the public lawfully using the alley not to permit its fire-escape apparatus to fall by reason of defendant's want of care, and if there is sufficient evidence that the injury to decedent resulted from a breach of that duty the case should have gone to the jury.

 While a plaintiff is not bound to prove his theory by evidence so clear as to exclude every other possible theory, where, as here, the evidence is wholly circumstantial, it must be such that plaintiff's theory is reasonably probable, not merely possible, and more probable than any other theory based on such evidence. Hayes v. Stunkard, 233 Iowa 582, 587, 588, 10 N. W. 2d 19, 22, and cases cited; Rodefer v. Clinton Turner Verein, supra, 232 Iowa 691, 697, 6 N. W. 2d 17, 20. Does the evidence, viewed in the light most favorable to plaintiff, meet this test? We agree with the trial court that it does not.

 On the day in question decedent did not leave the fourth floor until after 5 o'clock. There were four possible means of leaving: a passenger elevator, a freight elevator, an inside stairway, and the fire escape. It is not reasonably probable that decedent did not use the fire escape.

Mr. Seizer, president of the Packard Manufacturing Com-

pany, a witness for plaintiff, said on direct examination, "th· passenger elevator' is not accessible after 5 o'clock and the freight elevator is the only way we can leave the building at night." On cross-examination he said, "Occasionally the passenger elevator operates after 5, but such occasions were very isolated." The same witness testified on direct examination that defendant had forbidden the use of the inside stairway after working hours to. employees of the Packard Company. (Their usual quitting time was 4:30.) Mr. Seizer himself had so informed decedent and all employees had been so instructed.

Three Packard employees testified for defendant. In substance, Mrs. Daughenbaugh said, on the day in question she "quit work between 5 or 5:10"; she saw Mr. Born (decedent) right afterward: .

"He was out there by the fire escape window. I couldn't say what he was doing at the window as I went to punch the time clock. * * * I couldn't see him step out the window, what he was doing, because I myself and Miss Hudson were talking together and I didn't pay a lot of attention to him."

The window was open. After she punched the time clock, she turned around to go back to the freight elevator (near the southwest corner of the building) ; "* * * just a little bit afterwards we heard a crash, but I didn't know exactly what it was. * * * I just stood there and then looked out the window and seen him lying on the ground." After she saw Mr. Born standing at the fire-escape window she did not see him again at any point on the fourth floor: "The American Express Company was working in the rear of the freight elevator. I saw them down there. I could hear their voices. We were waiting to go down on the freight elevator. It was in use and we couldn't get it up." (The freight elevator had a push-button control.) She could not see Mr. Born while they were waiting at the elevator. Asked how long it was after she saw decedent standing at the fire-escape window that she saw him lying on the ground, she answered, "I imagine about a minute or a minute and a half or something like that." Mr. Born had his hat and coat on when she saw him.

Victoria Wener testified, in substance, she worked on the day in question till 5 or a little after: ·

"It must have been about 5. I saw Mr. Born around there about the time I quit * * * He was at the window. * * * He had two hands on the sill and put one leg over. Q. Was it the window at which the fire escape platform is on the outside? A. I believe it was. He had one leg on the sill and his hands were on the window sill. He was facing north toward Court Avenue. I don't know which leg it was he had on the sill. He was in that position the last time I saw him. * * * We heard a crash a few minutes after. * * * Someone said Mr. Born was lying in the alley."

On cross-examination Mrs. Wener testified:

"Q. You don't know whether he came back into the room after you saw him standing in the position you have described? A. I couldn't say. Q. You didn't see him after that time? A. No."

Miss Hudson testified, in substance, she worked that day until:

"* * * sometime after 5, a few minutes after 5. The last time I saw Mr. Born he was standing at the window as I came through the door from the workroom on my way to the time clock. I saw him in front of this window which is directly in front of the door. Q. And it is the window with the fire escape platform? A. I didn't know at that time, but it is the one since I have noticed marked 'Fire Escape.' Q. Was the window open? A. I don't know. I just glanced up and I saw him there at this window with his back toward me. I turned off to the time clock and rung out and I walked slowly back toward the freight elevator, and on my way I stopped at the scale and weighed myself, and that took some time. I saw them all standing around there. I didn't notice Mr. Born any more after I saw him when I glanced up as I came through this door. * * * I walked slowly back toward the elevator and stood there a few seconds I suppose, it seems some time but we stood there and Mr. Fine walked over to the elevator and pressed the button

again and it still didn't come, and he walked over to the window then and looked out and he says, 'There is Harry on the ground. He is hurt. Somebody call the ambulance.' "

None of the above testimony of Mr. Seizer and the three employees is contradicted. There is nothing to cast doubt upon its truthfulness. These three employees had finished work and were attempting to leave the building by means of the freight elevator. This confirms Seizer's testimony that the passenger elevator and the inside stairway were not available. The freight elevator was in use by others. That is the reason the women "couldn't get it up" and were compelled to wait on the fourth floor. Unless the testimony of Seizer and the three women is discarded arbitrarily, it is not reasonably possible, much less probable, that Mr. Born did not go down the fire escape. The only reasonable conclusion is that he did use the fire escape.

There is also this testimony of plaintiff's witness Sisson, an inspector in the fire-prevention bureau of the city fire department, referring to the time of an inspection made by him of this fire escape on February 16, 1943:

"I talked to Mr. Born about using the fire escape. I told him I knew of no law that would prohibit him from using it, however, it wasn't good practice."

Plaintiff argues that decedent may have succeeded in reaching the alley by means of the fire escape and have been injured by the fall of the apparatus while walking in the alley. Of course, this is possible, but it is conjectural and not reasonably probable, nor more probable than the opposing theory that the injury occurred while Mr. Born was attempting to use the fire escape. It would seem to be more probable that the cable broke while subjected to a strain, in addition to the weight of the movable stair, than that it broke while the movable stair was not in use.

Plaintiff relies on testimony that one of the two persons first to reach the body soon after the accident said it was then "about 5:20," while the latest estimate of the time Born was last seen on the fourth floor is 5:10. It is said this interval afforded plenty of time for decedent to have gotten to the alley

before he was injured. The witnesses, however, did not purport to be entirely accurate in their estimates of time. The testimony, in this respect, is no more than consistent with plaintiff's theory of how the accident occurred.

It is also argued that the basal skull fracture and the location of the body, with the head about ten feet north of the bottom of the fire escape, make plaintiff's theory reasonably probable. We have carefully considered this argument but are unable to agree with it, in view of all the physical facts immediately after the accident, together with all the other testimony. Plaintiff's witness, the coroner, a physician, testified he could not say positively whether the fractured skull was caused by a fall or a blow. Decedent also sustained a fracture of one wrist and a kneecap, several abrasions about the face, "a few minor abrasions about his extremities, about the knees," a cut lip, and his false teeth were knocked out. It is unnecessary to consider whether, as the trial court concluded, the existence of these other injuries is more consistent with defendant's theory.—Affirmed.

All JUSTICES concur.