WILLIAM J. DOUGHERTY, GEORGE M. DOUGHERTY, NELLIE W. DOUGHERTY, and RUTH WIKSTROM, dba DOUGHERTY STORAGE & VAN COMPANY, appellees, v. CITY OF SIOUX CITY, a municipal corporation, appellant.

No. 48492.

(Reported in 66 N.W.2d 275)

172

September 21, 1954.

Rehearing Denied November 19, 1954.

George F. Davis, City Attorney, and Wm. A. Shuminsky, City Solicitor, both of Sioux City, for appellant.

Sifford & Wadden, of Sioux City, for appellees.

BLISS, J.—Since the facts very largely control the determination of this appeal, they should be stated with some fullness. The named plaintiffs are brothers and sisters, operating as a partnership known as Dougherty Storage & Van Company, and own the ground and three-story building· thereon at 112 Pearl Street in defendant-city, used by them as a warehouse for the storage of household furniture, merchandise and other articles of commerce. The building which is of wood construction with an outside veneer of brick has a fifty-foot frontage to the west on Pearl Street, extends east and west two hundred feet, and has a height of forty-five feet. The foundation of the structure is of stone two feet thick and eight feet high. It has a full basement with a concrete floor, and a height of eight feet, with three floors above, each supported by piers, spaced twelve to fourteen feet apart throughout the building. The piers in the basement rest on stone flags four feet square and two and one-half feet thick. The stone foundation walls also rest on rock footings. A concrete loading platform is along the south side of the building and heavy plank platforms extend along the north side, and the west front, of the building. The outer end of the platform on the west side rests on a concrete foundation which abuts on the pavement of Pearl Street. The width of this platform is not shown, but from the picture, Exhibit 7, it appears to be about six to eight feet. The building is about fifty years old. All floors and the basement have been used for the storage of heavy merchandise. The weight capacities of the upper floors per square foot, as fixed by the defendant, are

respectively, for the first floor 300 pounds, for the second floor 225 pounds, and 150 pounds for the third floor. The building, from testimony and pictures, appears to be a substantial structure. There was railroad trackage on the north and the south sides of the building. The track on the south side extends west across Pearl Street.

All of the plaintiffs, other than Ruth Wikstrom, who was too ill to attend the trial, were witnesses. Nellie was the bookkeeper and the office supervisor, Ruth worked in the office, William looked after certain duties in the storage operation, and George attended to the warehouse and its maintenance and repair and the plumbing.

It was stipulated by the parties that defendant "is a municipal corporation that owns, maintains and operates the waterworks and water-distribution system in the city, and that it supplies its own needs for water for fire protection and other services, and for the transportation and sale of water commercially at rates fixed by it to users in Sioux City." It was also stipulated that the water main involved was laid by the defendant; that its depth below the level of the street was approximately five and one-half to six feet; that the joint in question was a lead and jute joint; and that the water pressure in this main was approximately 100 pounds per square inch.

It is the contention of defendant that although it installs all its water mains and extensions thereof and makes all taps or openings therein to make the water available to a private user, the latter must provide for the installation of all pipe lines and make all connections to bring the water from the public main to the property of the user.

The water main of defendant which made water available to plaintiffs' building consisted of separate lengths of circular pipe having an inside diameter of eight inches. One end of each pipe length was made into a bell-like shape, the inner circle of which exceeded eight inches in diameter. This end of the pipe is called the bell end and the other end is called the spigot end of the pipe. The water main was constructed by inserting the spigot end of one pipe into the bell end of another pipe, and then caulking the junction or joint so made, and so repeating

the maneuver until the main was completed. This water main was laid in a trench extending north and south in Pearl Street at a distance of between 20 and 30 feet west from the west line of plaintiffs' building. The record does not show when this water main was constructed.

City water was delivered to plaintiffs' building from this main in Pearl Street through just two pipe lines, both of which entered the property underneath the west foundation wall, and about midway between its ends. One of these was a pipe line with an opening six inches in diameter. The west end of this line was tapped into the defendant's main. The size of the pipe required a trench substantially as large as that of the eight-inch main. Plaintiffs hired the Grinnell Company years ago to install this six-inch line. The west end of the pipe line was between five and six feet below the surface of Pearl Street; and its east end, since it passed under the footings of the west foundation wall, was considerably lower than its west end. This pipe line serviced the sprinkler system in plaintiffs' building. It was for fire protection, and hence defendant speaks of it as the "fire line", and we will so refer to it. After passing under the west foundation wall this fire line was extended for about twenty feet east from the wall, under the basement floor, to a pit in the ground about three or four feet deep, where connection was made with pipes leading to the sprinkler system. There was never any leakage of water from this fire line, and defendant does not contend otherwise.

The second pipe line, and the only one other than the fire line, which supplied city water to plaintiffs' building, was a small lead pipe line, five eighths of an inch in diameter, belonging to plaintiffs, which serviced the toilets, lavatories and furnished water for drinking. This small line proceeding from a tap in defendant's main line ran along within three or four feet of the fire line. This service line passed through a water meter just inside the west wall of the building and then under the basement floor to the pit in the ground mentioned above. It is the contention of defendant that leakage of water from this small pipe line may have been a concurring cause to the damage, if any, to plaintiffs' building, and that since it was installed

by plaintiffs there was no liability on defendant for any damage so caused.

In support of defendant's contention that any damage to plaintiffs' building may have been caused by leakage from this lead pipe line of plaintiffs, defendant offered the testimony of but one witness—its chief witness—John Schoen, general water main foreman in charge of the maintenance crew, "the work of which is to repair leaks, extend water lines, and so forth." No member of this crew was called as a witness to corroborate the testimony of the foreman, with respect to this five-eighths-inch line. He testified that "a month or two" before July 5, 1949, he was in the building in connection with a report on ,a water leak in the building: "I don't recall definitely where the information came from * * *. When I first got there there was water coming up above the street in front of the place and upon checking, I found that there was a leak in the service line supplying the building. Each business or residence has two control valves. One is at the main where the connection is made, and the other is toward the building, usually in the parking." On cross-examination the witness testified: "The control box from the small pipe was situated in the street approximately ten feet from the main. Ordinarily these control boxes are in the parkings, but as there was no parking here, it was recessed into the paving so you can get at it this way." Going back to direct examination, the witness said: "The water I saw was coming up through the control box and also through cracks in the paving. I inserted a key into the control box and turned the valve but that didn't stop the flow. That indicated that the leak was somewhere between the valve and the main. Then it was necessary to break the paving and dig down to the main to shut it off. * * * Before digging down to the main I went into the building where, before the job was completed, I had a conversation with George Dougherty. When I got into the basement I did not observe any moisture around the foundation. There was just a trace of moisture on the bottom of the pit below the floor surface where the inside valve of the fire line is located. When I went down into the basement I heard the sound of seeping water. My purpose in going to the basement was to see whether or not there was water coming in onto the two pipes, the small one and the

fire line, to try to determine whether the leak might be in the small line or in the fire line. I believe the fire line was six inches big. The valve controlling ·it on the inside was in a three-foot-deep pit just dug in the basement ground. It was not a concrete pit. When I listened to the small line I heard the sound of escaping water. We determined that the line continued to leak after we shut off the outside control because the water continued to come above the ground. I then had the boys come down and dig it up at the main and shut the valve off at the main. There was no leak in the main or in the valve attached to the main. This is a lead pipe. *We didn't uncover it to determine where the leak was.* [Italics ours.] However, it was somewhere between the main and this other control valve. After I shut off the valve attached to the main, I listened for escaping water and the sound stopped. I had a conversation with Mr. George Dougherty concerning this supply line that we cut off and stopped at the main. I suggested that it might be advisable to abandon the outside line, that small one, and take a connection off of the fire line on the inside of the building to supply the house. This was done with his consent and the consent of the superintendent. We tapped the fire line on the inside of the building and connected it to this house supply line. After making the tap, we heard no sound of escaping water in the fire line between the main and the building. We did not hear the sound of any escaping water at that time. The small line from the valve on the main was within three or four feet of the fire line. We inspected the valve and the main at the time we shut off the small line. When we turned the valve off the sound of escaping water stopped. * * * The small line that was cut off from the Dougherty building was one of the older lines. I do not know what part of the water system of the Dougherty building the small line serviced. The extent of my examination of that line was to know that a meter was attached to it for service use and there was a meter inside the building." On cross-examination this witness testified: *"The city's operation, with reference to any water lines and mains, stops at the main itself. The city does nothing at all from the main on into the property other than to make the tap on the main."* (Italics ours.) It is undisputed that the italicized sentence just preced-

ing states the practice followed, that the property owner has the responsibility and the expense of getting the water from the city mains into his property. But if the testimony of Schoen hereinabove set out is true he departed from this practice in this instance. By a preliminary examination he satisfied himself that the leak was in plaintiffs' small lead pipe line, and that the break therein was somewhere between the outer control valve and the city main, a distance of ten feet. He then had his crew come out and break open the paving and dig a trench six feet deep and of such length as to enable a workman to get down into it and to close the valve at the main and cut off the water to plaintiffs' building. If the leak was in plaintiffs' pipe line the burden and expense of repairing it was upon them and not on the city. The location of the leak never was discovered. No explanation is given why some effort was not made to find its location, after a trench was dug over the lead pipe line. The witness merely said: "We didn't uncover it to determine where the leak was. However, it was somewhere between the main line and this other control valve."

The trial court in findings in its judgment and decree placed little probative or pertinent value on defendant's evidence respecting leakage in the small lead pipe line.

Of defendant's claim that the leakage was from the five-eighths-inch line, George Dougherty testified: "In addition to the large water main [the six-inch fire line] there was another small water line belonging to us for the toilets and lavatories. This line did not spring a leak that I know of. This line was never cut off that I know of. The city men joined the small line to the eight-[six] inch main inside the building in the three-foot pit under the basement floor, and we now receive water for our toilets and drinking from the big main. I don't recall just when they did this work. I don't know why they discontinued this line. No one from our place called them in connection with the separate water line prior to July of 1949. I did not call the city to come and determine whether they could find anything wrong. I called our plumber."

The small lead pipe line provided a service that was in continuous use in plaintiffs' building. A leakage in this line prob-

ably would have caused a noticeable interference with that use. There was no evidence of such interference. Plumbers employed by plaintiffs on two or more occasions examined these two lines and found no leakage in either. There was a water meter in the basement on the smaller line. Any serious leakage would probably have been apparent to the plaintiffs and to defendant, in the recording of the meter. There was no evidence of such discovery. Of this contention of defendant that any leakage from this small service line was the cause or a concurring cause of the plaintiffs' damage, the court in the ninth finding of its judgment and decree, after reference to the "defective joint" in defendant's main—which joint we will next comment on— said: "During all of the period commented on in these findings of fact, there is no evidence of any source of water that could cause the condition found in the soil under the west foundation wall of plaintiffs' building shown to have existed, except the water escaping from the leak in the defective joint. In this connection the court finds that the testimony of defendant in regard to the shutoff of a five-eighths-inch pipe some sixty days before the discovery of the leak from the defective joint is insufficient to raise any issue to the contrary."

It is our conclusion that there is substantial evidence to support the finding of the court.

We now discuss the "defective joint" mentioned by the court, just above.

On July 4, 1949, George Dougherty discovered water seeping through the west foundation wall and "quite a good deal of water" in the pit in the basement. Since it was a holiday he was unable to contact anyone connected with the city waterworks until the following morning, when Mr. Sutherland and foreman Schoen came down. Of the interview, George Dougherty testified: "* * * he [Sutherland or the foreman] thought one of our pipes had broken but I told him it didn't look to me like that; that we had had our pipes checked by a plumber on two or three occasions before, because we could hear water running and thought that it was probably our pipes. So he finally called his man and they broke open the pavement. I was there when it was opened up. It was under such pressure that the water oozed out onto the pavement; the water department crew

started digging, but water was filling the hole and they were digging out mostly mud. The men wore hip boots and after they got down aways they said the water was coming in too fast. They procured a pump and pumped the water out of the hole into a near-by sewer. When they got down to the pipe I could see the water gushing up from the under half of the joint. They couldn't go ahead and do the work because the water kept piling up on them so they shut off the water to the whole section at Third Street."

Of this joint, plaintiffs alleged in their petition (paragraph 6): "That the defendant * * * was negligent in the following particulars:

"(a) That it installed, as a part of said water main, a defective joint which broke, and for a period of time of more than six months permitted the escaping water to flow in, about, and against the foundations of the building of the plaintiffs, causing damage thereto, until finally when the water started coming in through the basement walls of the building of the plaintiffs, the employees of the city waterworks dug up the street and repaired the broken joint."

In support of this allegation of negligence plaintiffs called as a witness William E. Galligan, a member of the faculty of Iowa State College at Ames, Iowa, for twenty-six years, and an instructor in the civil engineering department in charge of sanitary engineering courses, including public and industrial water supplies and sewerage and hydrology courses. Prior to his work at the college he had practical experience beginning in 1919 with a consulting engineering firm dealing with water supplies and sewers. He was familiar by experience with the manner of laying and construction of waterworks lines and mains.

He testified to the proper method and long-recognized practice in making a joint to connect to sections of water mains, to wit: "The bell end of a water pipe and the spigot end of another water pipe are connected together by inserting the spigot end into the bell end, and use hemp or oakum or some similar material and lead to fill the annular space between the spigot end of one pipe and the bell end of the other pipe into which the spigot was inserted."

He testified that the inner half of the annular space was first thoroughly filled and tamped with the fibrous substance, and then the outer half was filled with molten lead, and before it was cooled the lead was compacted solidly in with a metal caulking tool struck with a hammer entirely around the circular joint. He testified that unless the lead was applied in a continuous and completed process at one time a defective joint would result which would be liable to give way under pressure of the water. A hypothetical question based upon pertinent facts was then propounded to the witness, and he was asked: "Now basing your opinion upon the evidence that you have given here in court and upon these facts that have been detailed to you, in your opinion is it probable that the joint in these two lengths of pipe permitted the water to escape as it has been detailed because that joint was defectively constructed?"

Defendant objected to the question on various grounds to wit: that there was no proper foundation; the witness under the hypotheses stated was not qualified; the opinion called for invaded the province of the court as a trier of facts; any answer of the witness would be a mere conjecture or speculation; and that the hypotheses contained other possibilities as to the presence of moisture under the building, and presented no proper foundation for an expert opinion. The objection having been overruled, the witness answered: "In my opinion the joint would not have failed if it had been made properly. Q. Then by 'failed' what do you mean? A. By having been acted on by forces other than the external forces outside the pipe, that is the lead would be extruded from the joint."

Mr. Schoen testified that for years the defendant had used the same method of constructing joints in the mains and extensions as described by Professor Galligan, although rubber rings had at times been used instead of fibrous packing. Although there was no evidence when the joint in question had been made, it was conceded that it had been made with jute packing and lead.

Professor Galligan testified that use of the method would not, in itself, insure a proper joint. He testified on cross-examination: "Q. In the normal and ordinary construction of a joint

as you have described it, tell the court whether there is any possibility of a joint failure even if the workman does use that care? A. If a joint is made properly, and that involves a considerable amount of skill on the man making the joint, it is only a man that is well qualified that can make a good joint, *even if he does go through the routine that I suggested* [italics ours], but the joint wouldn't fail unless it was for some other reason than being pushed out of the annular space by the water pressure. Q. Professor, is there a possibility of air leaks forming when the metal is poured when the spigot end and the bell end are level to the ground, that is in a horizontal position? A. In my opinion if the lead is at the right temperature and everything is done properly, and a lead joint is poured in an eight-inch piece, it is not possible to get air spaces."

Mr. Mead, an employee of the Sioux City Water Department, testified for defendant. He was one of its employees who dug the trench, on July 5, 1949, to expose the defective joint, and to repair the leak by recaulking the joint. He testified: "When we uncovered the joint we found the lead at the joint had slipped out a little bit, probably a quarter or a half inch and about two inches in length around the pipe. The opening between the lead and the pipe was very small. I couldn't say exactly. It was just big enough for water to get through. When we got there the water was coming through the cracks in the pavement above the ground. * * * The ground on the bottom of the ditch was wet."

At this time the water was escaping from the leaking joint with such volume and force that the trench rapidly filled with water until pumped out, and the valves in the main north and south of the trench had been closed. Photographs show the extremely muddy and sodden condition of the earth about the joint and the contiguous pipes so far as exposed by the eight-foot trench, and the large size of the hose attached to the electric pump used in withdrawing the escaping water. The two water lines servicing plaintiffs' building were within three feet of each other and tapped the main within four or five feet of the newly excavated trench, but were not exposed by it. Mr. Schoen testified that escaping water from a leak in a water main percolates

in the area of least resistance, which is along the line of the new ground made in refilling the trenches after the pipe lines were laid. It would thus escape north and south along the main west of the west foundation wall of plaintiffs' building. The most accessible escape for the leaking waters was through the refilled earth in the trench of the six-inch "fire line" passing under the west foundation wall and then under the basement floor, and under and about the rock footings of the piers in that portion of the basement. There is also uncontradicted testimony that, commencing about a year prior to July 4, 1949, on a number of occasions water was observed on the paving in Pearl Street at a sewer manhole near defendant's water main. This manhole was a hundred feet, more or less, south of the plaintiffs' building. It was south of the defective joint. This water would appear on the pavement in dry weather when there had been no recent rain.

With reference to these appearances of water, George M. Dougherty testified: "There was a small sewer manhole on Pearl Street 100 to 150 feet south of the building in 1948 and 1949— in 1949 I noticed water had piled up on the pavement around the sewer. This we had seen a number of times when it was dry and hadn't been raining and there was no occasion for water to stand on the pavement. I saw water there six months to a year prior to July 4, 1949. I went over to this manhole four or five months before the time the water entered our basement when some men were there. I saw a truck of the City of Sioux City there. I doubt that I would know them. I heard the conversation of these men. Q. What if anything was said by them at that time that you heard? (Objection to the question was overruled when plaintiffs limited the purpose of the testimony to the question of notice to defendant.) A. I can't say just what their words were. I heard them talking about it, and they saw the water there. I walked over when I saw them stop and go over to the pipe and stop there looking the deal over and talking about it. And I said to one of them. 'There is something wrong here that is causing this water to run on this pavement, there is a leak or something down there, because I have noticed this before.' And they went on talking between themselves re-

garding the matter, and I don't remember what the words were. And soon they left. Q. What was the substance or gist of their conversation? A. They were more or less in doubt themselves as to where the water was coming from, and as I understood they were discussing between themselves whether it was a leaky pipe or what might be causing it."

The first and only direct evidence of the definite location of the place of leakage in the water system of either the defendant or of the plaintiffs was when the excavation was made to the main on July 5, 1949. No breach was located in the five-eighths-inch line. Schoen surmised there was such a breach, but any proof thereof is very weak. There was no leak in the fire line. But for probably a year prior to July 4, 1949, there was much evidence that water was escaping. But one other source of leakage was available. Its exact location was discovered on July 5, 1949, when the defective joint in the main was found. There was no direct evidence of the inception of that breach or of how gradually or precipitately it may have enlarged. But it furnished a definite source of water leakage that had been indirectly evidenced in various ways. No other source being shown in evidence for the surface water at the manhole, it is a fair assumption that escaping water in following the line of least resistance would percolate through the dirt refill in the main line trench from the defective joint to the manhole.

With much greater certainty it may be inferred that it would percolate the much shorter distance from the main line down the refilled dirt in the trench for the six-inch fire line under the west foundation wall. It would take just as large a trench for a six-inch pipe as for an eight-inch pipe, and the slope of the six-inch trench from the main water main to below the foundation was definitely downgrade.

In the summer of 1948 the brick veneer in the center of the west wall began to show cracks and to settle and bulge and the Chris Hansen Contracting Company was employed to tie the veneer in place by steel plates bolted to the frame of the building. About this time the piers and the west wall and the first and second floors and the basement floor were observed to have settled. The basement floor and piers were repaired in the fall

of 1951. George Dougherty testified that he heard the sound of escaping water four to six months prior to July 4, 1949, but the plumber who inspected their pipes for leaks could find none.

The sewer pipe for plaintiffs' building extended, under the west foundation wall and below the six-inch fire line pipe, to the main sewer line in the street. Sometime after July 4, 1949, plaintiffs began to notice a disagreeable odor about the place and at first thought it was escaping gas but no gas leaks were found. A plumbing company was later employed to ascertain what was the trouble. The plumber who did the work was a witness for plaintiffs. He testified: "In January of 1950 I replaced a sewer that had broken down in the Dougherty Storage & Van Company warehouse, the sewer entered the building under the front, or west, foundation wall; the water pipe also entered at this point right above the sewer. We dug down to the sewer where it entered the building and found the foundation wall lying right on top of the water pipe and it was in contact with the sewer which was crushed. The basement floor was also bent up along the course of the sewer line inside the building for about 20 feet back into the building. From the place the sewer entered to 20 feet inside the building the soil along the sewer line was so muddy that work couldn't be done until boards were laid down to walk on * * *; I don't remember that there were any cracks in the wall at the point where the water pipe came in contact with the sewer, *but the wall was resting on the water main. The wall was definitely down."* (Italics ours.)

George Dougherty was present when the plumber was working and confirmed his testimony. Speaking of the soil about the building, he said: "It was normally dry at most times. It is a sort of a clay soil and it has a little sand in it. After the plumbers were there we removed the brick from the west wall and replaced it with Perma-Stone. Some piers were jacked up and shimmed to level and in many places we put further concrete footings under the piers. We moved quite a bit of the merchandise from the basement up to other floors before starting the Perma-Stone work, the west foundation wall was leveled by putting cement across the top of it. The cement was

about six inches wide and five inches deep in the middle and tapered off to the two corners. * * * The floor on the west end of the first floor sagged and we put a temporary false floor over the existing floor. During the fall of 1951 my brother tore out the old concrete floor which had sagged down and replaced it with new concrete."

Arthur Hardy, of the Hardy Construction Company, at the request of plaintiffs made an examination of the west wall of the building early in 1952 with respect to its repair. He estimated the cost at $3850—"This includes all labor and material to be used for the pouring of six new post footings, the leveling of the floor sections over these posts, and the construction of a reinforced concrete wall across the front of the basement and ten feet back on the south wall."

Jack Jacobs, a witness for plaintiffs, testified: "I installed the Perma-Stone facing on the Dougherty building in the fall of 1950. I charged $1900 for the job. The foundation had a sag in the center of the wall and I wanted that rebuilt so that the Perma-Stone would look level and straight. This was done. The cost of the Perma-Stone installation would be about two thirds of the cost of installation of a new brick facing wall. I think the difference in the cost between the new brick and old brick would be rather a substantial item in figuring the cost of replacing the brick veneer on the front of that building. I have no idea what the cost of replacing the west wall with a used brick of like quality as was in there at the time of the claimed damage to the building would have been at the time the repairs were made because used brick varies considerably in price and labor."

William J. Dougherty gave much corroborating testimony, to wit: "I personally observed the condition of the west foundation wall in the building from the fall of 1948 down to the present day. There were cracks and openings in the wall and it was bulging out. I did not observe any sinking in the north or south or east wall. * * * The whole floor of our basement is concrete with about 35 to 40 feet covered with heavy planking. This concrete floor was broken up along the sewer line. A new concrete floor at the west end of the basement was put in in the

fall of 1951 after we leased the building to the Schneiderhahn Company on July 15, 1951. We paid for the labor and they paid for the concrete. The west foundation wall was leveled up with concrete. It was six to seven inches deep in some places. * * * We also put a false floor on the west end of the first floor." On cross-examination he testified: "I suppose we first started to notice the settling in the floor in 1948. * * * The floor of the basement broke up about 25 feet north and south and 24 feet back from the west wall so that the damaged area was roughly a square 25 x 24 feet in extent. We actually repaved a piece between 60 or 70 feet by 50 feet. * * * The floor constructed on the first floor as a temporary floor is a mill construction. It is fir, tongue-and-groove flooring, and was put in about a year after July 4, 1949. It was laid on two by fours which were shimmed up to level. It covers an area about 30 x 50 feet. We are not claiming anything additional for repairing this floor further. The second floor has not been repaired and remains in the condition that it has been since 1949."

Nellie Dougherty corroborated much of the testimony given by her brothers and other witnesses. With reference to the small sewer manhole south of their property, she testified: "I noticed water there in the year preceding July 4, 1949, * * * but I did not go out there. In September after the main was opened that summer I noticed an odor like gas in the office all the time. * * * I recall Chris Hansen doing some work on the west wall in October of 1948. Prior to that I noticed a crack in the wall. In 1949 sometime, the floor of the display room along the west wall seemed to sink. This condition continued until they put a temporary floor in there. They leveled it off. I was present when Mr. Jacobs put Perma-Stone on the building. You could notice that the west wall seemed to sink in the center. * * * When they laid the false floor they had to remove the wiring and the plugs that would be covered up. * * * Chris Hansen put some plates in the west wall in 1948 and tied the brick and wooden wall together by steel rods which went through the walls. I noticed the sinking in the foundation in 1949. The sinking was very noticeable. I first saw the crack in the wall in the fall of 1948. The picture, Exhibit 4, doesn't show the sinking or the crack

as much as it seemed to me. * * * I don't know when the picture was taken, but it was close to the time the Perma-Stone was put on. I was not present." This witness identified numerous statements of accounts and invoices for material and labor furnished in repair of damage to the west foundation and wall, the basement and first floor and supporting piers, and the checks given in payment therefor. The total of these checks was substantially in excess of the amount of damages found by the court.

The defendant, in addition to the testimony of Mr. Mead and Mr. Schoen, which we have referred to quite fully, offered only the testimony of Mr. Gaynor, largely of an expert nature. None of the testimony offered or received directly or indirectly contradicted materially or in substance any of plaintiffs' evidence. Mr. Gaynor, a civil engineer, graduating from Massachusetts Institute of Technology in 1909, gave some testimony as to soil and flood conditions in past years in Sioux City. He was familiar with the location of the Dougherty building and said that within the past fifty years the river had been within a hundred feet of it. He also said that "in a large area of this part of downtown [in the neighborhood of the city hall] if you want a big building to stand up you have to put piling under it." He was asked a hypothetical question assuming a building of the type, size, structure, and use of the Dougherty building, fifty years old, whether he had an opinion that the veneer brick on such a building would crack because of the weather conditions and the natural and normal ageing of the building. Objections to the question and offer of proof were sustained.

Another question assuming all the hypotheses in the first question and additional ones relating to soil conditions and water level and proximity to the Missouri River called for an opinion as to their effect with relation to the settling of the building. Objection to the question was sustained. Both parties then closed their testimony.

There was no prejudicial error in the court's ruling on either hypothetical question. Any answer by the witness that time, soil condition, water level, weather or proximity to the Missouri River had any bearing on the damage to the west wall

of the building would have been refuted by undisputed evidence that each of the four walls of the building had been equally subjected to the effects of the stated conditions and none of them had been injured thereby, beyond the usual incidental wear. Only the west wall had been subjected to defendant's escaping water, and only the west wall and the piers and floors adjacent settled.

The district court in its judgment and decree, covering fifteen pages of the printed record, fully and fairly reviewed the evidence, and its findings and conclusions have substantial support in the evidence and the admissions and stipulations of the parties. The court found that plaintiffs had established the allegations of their petition, as noted herein, by evidence substantially as we have set out—that: "although the building had been used for years as a storage warehouse, no settling in any part of it had taken place" except in and adjacent to the west wall, where "during the period of approximately eight months or more prior to July 4, 1949, the sound of running water was heard from inside the building of plaintiffs on a number of different occasions", and, "before and after the discovery of the water escaping from the defective joint, it was observed that the west foundation wall of the plaintiffs' building was settling"; in January 1950, when the sewer pipe was found crushed under the west foundation wall, "the ground was so thoroughly saturated as to be almost mud * * * and no other source of the water creating the condition in the soil than the previous defect in the joint in the main was shown"; "the joint which had given away was about directly opposite the center of the west wall of the building and was located not over 25 feet from this wall."

The court specifically set out the items of damage to the plaintiffs' building, and the repairs and reconstruction made and necessary to be made, because of the leakage from defendant's water main, as established by the evidence, and found:

"The reasonable value of the work and materials required to put the building back in substantially the same condition it was prior to the damage is $7916.93. In arriving at a reasonable value of the work and materials necessary to rehabilitate

the building, the court excludes from its consideration all items not shown to have been directly required to put the building back in its former condition, and excludes from its consideration the claims for labor made on behalf of plaintiffs George and William Dougherty, and, in view of the fact that the brick veneer exterior wall had been in place for a number of years, depreciates the cost of the Perma-Stone facing that was put on in place of a new brick veneer wall, one half. It appears the building can be put in substantially the same condition as it was before the damage to it by settling. The evidence introduced that the difference in the value of the building before and after the settling was $15,000 is not considered by the court in arriving at its decision, for this reason. No evidence was offered by the defendant as to the nature and extent and reasonable value of the damages sustained by plaintiffs."

In its conclusions of law the court found that: defendant was operating its waterworks system in its proprietary capacity and was liable for damage negligently caused in the construction, operation and maintenance thereof; the joint which permitted the water to escape was negligently made; defendant was negligent in its inspection of the system and in failing to discover the break and repair it, since there was evidence of knowledge brought home to it some months prior to July 4, 1949, and that the condition existed for such time it would, and should, have discovered it in the exercise of ordinary care; the escape of the water from the defective joint was the proximate cause of the damage to the building, and is more probable than any other conclusion or theory based upon the evidence offered in contradiction thereof; "this conclusion becomes the only reasonable and logical conclusion that can be drawn from the evidence in that the record fails to show any other probable source of the water which saturated the soil under and around the west foundation wall and caused it to settle, and because it is undisputed that the condition found in excavating the main was that to be found where a break had existed for some period of time." The court found plaintiffs were free from any contributory negligence.

The probability that water was escaping from the defective joint for a considerable period of time is not only indicated by the testimony in behalf of plaintiffs, but finds support in the testimony of defendant's witness, Mr. Schoen, who testified: "When the pavement was opened [July 5, 1949] I could not at that time determine the amount or extent of any trapped water under the pavement or the length of time it had been there * * * because it is impossible to determine in any way how long a leak is running or has been running before it finally shows up somewhere."

Appellant states that the following questions are presented on this appeal: (1) Are the court's findings of fact sustained by the greater weight of substantial competent evidence? (2) Did the court properly conclude the joint in the main was negligently made? (3) Does the evidence sustain the court's conclusion that the leaking water was the proximate cause of the damage to the building? (4) Was the duration of the leak such that defendant should have discovered it in the exercise of ordinary care? (5) Were plaintiffs free from contributory negligence? (6) Was there competent evidence to sustain the court's allowance for restoring the building?

It is our conclusion that there was substantial evidence to sustain the court's affirmative answer to each question.

I. This action, being one at law, in which a jury was waived and trial was had to the court, is not triable de novo on appeal, but, in accord with the uniform decisions of this court and rule 334, R. C. P., is reviewed on errors assigned, and the findings of fact by the trial court have the effect of a special verdict and are equivalent to the verdict of a jury, and, if supported by substantial evidence and are justified as a matter of law, the judgment entered will not be disturbed on appeal. The question for determination is whether the trial court's finding is supported by substantial evidence, and we will not weigh the evidence or the credibility of the witnesses. Davis v. Knight, 239 Iowa 1338, 1340, 1341, 1352, 35 N.W.2d 23–25; Brown v. Compton & Roush, Inc., 243 Iowa 665, 671, 53 N.W.2d 164; Turner v. Zip Motors, Inc., 245 Iowa 1091, 65 N.W.2d 427; In re Estate

of Puckett; 240 Iowa 986, 1000, 1001, 38 N.W.2d 593; Miller v. King, 240 Iowa 1336, 1338, 39 N.W.2d 307; Roth v. Headlee, 238 Iowa 1340, 1342, 29 N.W.2d 923; In re Estate of Conner, 240 Iowa 479, 487, 36 N.W.2d 833; Augusta v. Jensen, 241 Iowa 697, 699, 42 N.W.2d 383; Carlson v. Bankers Trust Co., 242 Iowa 1207, 1214, 50 N.W.2d 1; Cleary v. Wolin, 244 Iowa 956, 58 N.W.2d 830; Ruble v. Carr, 244 Iowa 990, 993, 59 N.W.2d 228, 230; Dahl v. Allen, 243 Iowa 808, 813, 53 N.W.2d 759; Nelsen Auto Sales, Inc. v. Turner, 241 Iowa 927, 930, 44 N.W.2d 36.

■ II. In the operation of its waterworks system in a proprietary function or capacity the defendant-city was liable for injury to the property of the plaintiffs caused by the negligence of its employees, under the doctrine of respondeat superior. Rowley v. City of Cedar Rapids, 203 Iowa 1245–1247, 212 N.W. 158, 53 A. L. R. 375, and cases cited; Miller Grocery Co. v. City of Des Moines, 195 Iowa 1310–1315, 192 N.W. 306, 28 A. L. R. 815. In the case last-cited the facts were similar to those in the case before us. The grounds of negligence were that the joint connecting the hydrant and the pipe leading to the main was improperly constructed and that the city had failed to repair the connection after notice of the faulty connection. In affirming a judgment for the plaintiff, this court on page 1314 of 195 Iowa said: "If the city negligently failed to properly lay and close said pipe, which carried water for commercial purposes, there is no reason in law or logic why the city, in its proprietary capacity, should not be held liable for its negligence in so doing."

■ III. It was established without question that there was a defective joint between two pipes in defendant's water main approximately twenty-five feet from the place in the west foundation wall which had settled. There was substantial evidence that water probably had been leaking from this joint for several months or a year and had thoroughly saturated the ground about and under the wall. Plaintiffs were not required to prove these facts by evidence so clear as to exclude every other possible theory. They were required only to prove that their theory of causation was not only reasonably probable but that it was more probable than any other theory of causation under the evi-

dence presented. The evidence fairly weighed produces the conviction that the facts reasonably support the theory and contention of plaintiffs. Latham v. Des Moines Electric Light Co., 229 Iowa 1199, 1207, 296 N.W. 372; Central Nat. Bank & Trust Co. v. Lederer Strauss & Co., 236 Iowa 16, 19, 17 N.W.2d 817; Hayes v. Stunkard, 233 Iowa 582, 587, 10 N.W.2d 19; Haverly v. Union Constr. Co., 236 Iowa 278, 282, 18 N.W.2d 629; Cable v. Fullerton Lumber Co., 242 Iowa 1076, 1082, 49 N.W.2d 530; Stickleman v. Synhorst, 243 Iowa 872, 877, 52 N.W.2d 504; Schwartz v. Helsell, 243 Iowa 95, 99, 50 N.W.2d 573.

IV. There was direct evidence that the leaking joint was negligently made. Without objection Professor Galligan testified to the proper and accustomed way of making such a joint, and that if thus made it would not give way under water pressure. In answer to a hypothetical question he stated that in his opinion the joint would not have failed if it had been made properly. Objection to this question was rightly overruled. Defendant offered no testimony to the contrary.

V. While defendant had no knowledge prior to July 5, 1949, that the joint in the main was leaking, employees of the defendant months before that observed water leaking through the pavement near the sewer manhole adjacent to the water main, and at that time were told by George Dougherty that he had observed that condition a number of times before and he told them that there must be a leak there. Sixty days before July 1949 Mr. Schoen, by information from some unnamed source, had noticed there was a leak near the Dougherty building and at that time found water coming through the pavement within a few feet of the place where it was coming through on July 5, 1949. He went into the basement and heard the seeping of water and surmised it was leaking from the small lead pipe line, which he shut off after a cursory examination. But he made no attempt to definitely locate the leak. He said the sound of escaping water ceased, but it was still trickling and coming through the foundation on July 4, 1949. The evidence justified the court in finding that the duration of the leaking water was of such length to defendant's knowledge that it should have dis-

covered, or should have taken action to discover, the location of the leak.

VI. There was no evidence of any contributory negligence on the part of plaintiffs.

VII. There was definite proof of very substantial damage to plaintiffs' building caused by the leaking water. Invoices of material and labor in repairing the damage and restoring the building to its condition prior to its injury, and checks showing the money expended therefor were introduced in evidence. Evidence was also introduced of the reasonable expense of restoration yet to be made. The court reduced considerably the amount of damages claimed by plaintiffs and for which they offered proof. There was substantial evidence sustaining the amount of $7916.93 allowed by the court and for which it entered judgment.

When invoices and checks in payment amounting to $153.50 were offered, defendant's objection was made that no proper foundation had been laid for their introduction and they did not represent a proper measure of damages. The objection was overruled. When the remaining exhibits showing the items of expense paid in repairing the damaged building were offered and defendant objected to these exhibits, the court said: "Is there any objection if I make no ruling upon these objections until some later period? I am entirely unfamiliar with what they are." Plaintiffs' attorney answered: "You will have to look them over." Defendant's attorney said: "That is satisfactory."

The court did not rule upon defendant's objections to these exhibits, either separately or as a whole. After making specific objections to each exhibit, defendant closed its case without calling the court's attention to its failure to rule or requesting a ruling on any objection made. As defendant rested, it stated: "At the close of all the testimony of both plaintiffs and defendant, renews all its motions to strike made at the close of the plaintiffs' testimony, and now renews the motion to dismiss plaintiffs' claim for all the reasons heretofore stated." The record shows no ruling on the motion and shows no motions theretofore made, as referred to in the closing motion, nor the grounds thereof, nor any rulings of the court thereon. Defendant did not

move for new trial nor for judgment or any modification thereof under rule 179, R. C. P., and took no exceptions to the court's findings of fact, conclusions of law, judgment, or to other rulings. The only matter for our consideration is the sufficiency of the evidence to support the findings and judgment of the court allowing damages in the sum of $7916.93. The exhibits showing the items for which the expenditures were made and the amounts thereof aggregating said sum are briefly condensed in the record, but the court had the itemized exhibits before it in full, and also the testimony of the estimated expense of other repairs and reconstruction of the building damaged by defendant's negligence, yet to be incurred, and computed therefrom the amount of the allowance for which it rendered judgment. As stated in its findings, the court excluded "from its consideration all items not shown to have been directly required to put the building back in its former condition", and also reduced the amount of the allowance because of depreciation of some of the building which was replaced. All of the evidence bearing on the amount of the allowance was properly before the court. Of this amount $153.50 was evidenced by checks of the partnership of which plaintiffs were members, designated as Exhibits 10 to 27, inclusive, and Exhibit 29. When defendant objected to them the court ruled that "it would admit them at this time."

When Exhibits 28, and 31 to 141, inclusive, which evidenced the balance of the expenditures, were offered, defendant, as hereinbefore noted, consented to the court's reservation of ruling on the objections. No rulings on these objections were made or refused by the court, and defendant did not ask or insist that they be made. The defendant had a right to insist on a ruling of its objections and having voluntarily declined to do so the court was justified in presuming that it waived its objections. This court has so held many times in law actions tried to the court. Many more of our decisions could be cited than we now mention. Gable v. Hainer, 83 Iowa 457, 459, 460, 49 N.W. 1024; Rosenthal & Co. v. Bilger, 86 Iowa 246, 248, 53 N.W. 255; Payne v. Dicus, 88 Iowa 423, 426, 427, 55 N.W. 483; Langhammer v. City of Manchester, 99 Iowa 295, 297, 68 N.W. 688; Shroeder v. Webster, 88 Iowa 627, 630, 55 N.W. 569; Murphy v. McCarthy,

108 Iowa 38, 40, 78 N.W. 819; Bean v. Bickley, 187 Iowa 689, 704, 705, 174 N.W. 675; In re Estate of La Grange, 191 Iowa 129, 131, 132, 181 N.W. 807; Henry v. Henry, 192 Iowa 1346, 1348, 186 N.W. 639; B. F. Avery & Sons Plow Co. v. Olson, 199 Iowa 134, 136, 201 N.W. 562; Federal Schools v. Barry, 195 Iowa 703, 704, 192 N.W. 816; Chase v. City of Winterset, 203 Iowa 1361, 1362, 1363, 214 N.W. 591; Lee v. Farmers Mutual Hail Ins. Assn., 214 Iowa 932, 935, 241 N.W. 403; In re Estate of Coleman, 238 Iowa 768, 769, 770, 28 N.W.2d 500; Carlson v. Bankers Trust Co., supra, 242 Iowa 1207, 1214, 50 N.W.2d 1; Petit v. Ervin Clark Construction Inc., 243 Iowa 118, 127, 128, 49 N.W.2d 508.

We find no reversible error, and it is our conclusion that the findings and judgment of the district court are sustained by substantial evidence. The judgment is therefore affirmed.—Affirmed.

GARFIELD, C. J., and OLIVER and MULRONEY, JJ., concur.

SMITH, J., concurs in result.

WENNERSTRUM, J., dissents, and HAYS, THOMPSON and LARSON, JJ., join.

WENNERSTRUM, J. (dissenting)—I am unable to agree with the conclusions reached in the majority opinion and respectfully dissent.

Despite the extensive review of the evidence in that opinion there are some facts therein referred to that justify further comment and, in my opinion, merit an entirely different conclusion than the one reached by the trial court and the majority. These facts, and the absence of other evidence, necessitate, in my opinion, a ruling by this court that there is no basis for the trial court's findings of fact as a matter of law.

It should be kept in mind that it was pleaded by the plaintiffs the leak in the defective joint permitted water "* * * to flow in, about, and against the foundation of the building of the plaintiffs * * *" and "* * * the action of the water undermined the west wall of the building, causing it to sink, the floors to

sag and the walls to crack" and further that "* * * said negligence was the proximate cause of the injury and damage sustained by the plaintiffs. * * *."

Now let us examine the claimed injuries, when they occurred and see whether the evidence presented in any manner supports the allegation made in the plaintiffs' petition.

William J. Dougherty, one of the plaintiffs, testified in his original examination: "I personally observed the condition of the west foundation wall in the building from the fall of 1948 to the present day. There were cracks and openings in this wall and it was bulging out. I did not observe any sinking in the north or south or east wall." On cross-examination he testified: "I suppose we first started to notice the settling in the floor in 1948. * * *." George M. Dougherty, another of the plaintiffs, testified, in part: "The cracks in Exhibit 4 appeared in 1948. The settling started to show up in the fall of 1948. The piers started to show damage in 1948 by settling. The settling in the first and second floors also started to show up then. The basement floor began to sink at that time. Chris Hansen put the clamps on the building in 1948. That was the only work done in 1948. * * * There are small cracks in the north, east and south walls, but I wouldn't be able to say how many years they have been there. There hasn't been any particular change in the walls other than normal condition would bring about in the passage of time."

Nellie Dougherty, another of the plaintiffs, testified in part, on cross-examination: "Chris Hansen put some plates in the west wall in 1948 and tied the brick and wooden wall together by steel rods which went through the walls. I noticed the sinking in the foundation in 1949. The sinking was very noticeable. I first saw the cracks in the wall in the fall of 1948. * * *."

From the foregoing testimony of three of the four plaintiffs (one being ill and unable to come to court) we must determine whether there was any causal connection between the claimed damage to plaintiffs' building and the alleged negligence of the city by reason of the claimed defective joint. Admitting that in July 1949 a defective joint in the water main was shown, yet before plaintiffs would be able to recover there should be some showing of causal connection between the leaking joint and es-

caping water and the cracked wall, the sinking of the west wall, and the sag of the floors.

I am unable to find in the record any evidence that water from the broken joint came into the building on or about July 4, 1949, or at any earlier time. It is true that as a result of the leak in the joint in the main, water came up through the pavement of the street on the west side of the building on July 5, 1949. It is also true water came into the building from some place early in July 1949 but there is no connection shown between this condition and the defective joint. It may be admitted there was water observed near the sewer pipe which was discovered to be broken in January 1950. However, this does not necessarily indicate that the water observed either in December 1949 or January 1950 near this sewer pipe developed as the result of the defective joint in the water main which was repaired on July 5, 1949. It is more logical to believe that the water observed about the broken sewer pipe was the result of that condition, rather than from water seeping from the defective joint. In the majority opinion it is stated: "Mr. Schoen testified that escaping water from a leak in a water main percolates in the area of least resistance, which is along the line of the new ground made in refilling the trenches after the pipe lines were laid. It would thus escape north and south along the main west of the west foundation wall of plaintiffs' building. The most accessible escape for the leaking waters was through the refilled earth in the trench of the six-inch 'fire line' passing under the west foundation wall and then under the basement floor, and under and about the rock footings of the piers in that portion of the basement. There is also uncontradicted testimony that commencing about a year prior to July 4, 1949, on a number of occasions water was observed on the paving in Pearl Street at a sewer manhole near defendant's water main. This manhole was a hundred feet, more or less, south of plaintiffs' building. It was south of the defective joint. This water would appear on the pavement in dry weather when there had been no recent rain."

If water from this defective joint was sufficient to cause it to be observed near a sewer manhole in Pearl Street one hundred feet south of the building it is logical to believe that there would have been sufficient water to flow along the "fire line" and to

disclose a great amount of water coming into the building at an earlier time than it was observed in the street. We must remember it was not until July 4, 1949, that water was observed in the basement of the plaintiffs' building and it was not until December 1949 or January 1950 that water was observed about a broken sewer pipe under the west wall.

Yet in the light of the facts previously stated the majority find justification to make the following statement:

"But for probably a year prior to July 4, 1949, there was much evidence that water was escaping. * * * Its exact location was discovered on July 5, 1949, when the defective joint in the main was found. There was no direct evidence of the inception of that breach or of how gradually or precipitately it may have enlarged. But it furnished a definite source of water leakage that had been indirectly evidenced in various ways. No other source being shown in evidence for the surface water at the manhole, it is a fair assumption that escaping water in following the line of least resistance would percolate through the dirt refill in the main line trench from the defective joint to the manhole.

"With much greater certainty it may be inferred that it would percolate the much shorter distance from the main line down the refilled dirt in the trench for the six-inch fire line under the west foundation wall. It would take just as large a trench for a six-inch pipe as for an eight-inch pipe, and the slope of the six-inch trench from the main water main to below the foundation was definitely downgrade.

"* * * The basement floor and piers were repaired in the fall of 1951. George Dougherty testified that he heard the sound of escaping water four to six months prior to July 4, 1949, but the plumber who inspected their pipes for leaks could find none."

It will be observed that the majority, from the indefinite facts shown, are able only to draw an inference. This is not sufficient. The majority state that there was sufficient water from some leak to force it up through the pavement and around a sewer manhole 100 feet from the later discovered defective joint. However, the majority is not able to find in the record that six

months or a year before the defective joint was discovered water came into the building. And the distance to the building was only 25 or 30 feet from the later discovered defective joint, while the water that was observed in the street was at least 100 feet from the claimed defective joint.

Consequently I am unable to find any substantial facts whatsoever that justify a submission to the court, as a trier of facts, of the question of the causal connection between the defective joint and leaking water and the cracked walls, sagging floors and sinking walls.

I.  The burden is upon the plaintiff to show causal connection between the negligence claimed and the injury, 65 C. J. S., Negligence, section 209, pages 970–972. It is true both negligence and proximate cause are fact questions for the usual determination of the jury, and in this case the court, if the evidence is of sufficient weight and character to warrant their submission and consideration. Whetstine v. Moravec, 228 Iowa 352, 362, 291 N.W. 425. However, in order to hold a defendant liable for negligence, it must appear the negligence claimed had some causal connection and was the direct and proximate cause thereof. Albrecht v. Waterloo Constr. Co., 218 Iowa 1205, 1216, 257 N.W. 183; Hecht v. Des Moines Playground and Recreation Assn., 227 Iowa 81, 99, 287 N.W. 259; Harvey v. Knowles Storage & Moving Co., 215 Iowa 35, 41, 244 N.W. 660; Isaacs v. Bruce, 218 Iowa 759, 765, 254 N.W. 57. And it has been the holding of this court that in matters of proof a litigant is not justified in inferring a fact as proven from the mere possibility of the existence of facts. Phillips v. Briggs, 215 Iowa 461, 465, 245 N.W. 720, and cases cited.

II.  Where the evidence, as disclosed by the record, shows there is no support for the conclusions announced by the trial court in law actions tried to the court we should reverse. Miller v. Woolsey, 240 Iowa 450, 458, 459, 35 N.W.2d 584; Ida Grove Independent School Dist. v. Ida County, 226 Iowa 1237, 1241, 286 N.W. 407; Haldeman v. Addison, 221 Iowa 218, 227, 265 N.W. 358; First Presbyterian Church v. Dennis, 178 Iowa 1352, 1364, 161 N.W. 183, L. R. A. 1917C 1005.

III.  Inasmuch as this is an appeal in a law action tried to the court without a jury the trial court's decision on the facts

must stand unless the defendant would have been entitled to a directed verdict as a matter of law if there had been a jury trial. Roth v. Headlee, 238 Iowa 1340, 1342, 29 N.W.2d 923. I am firmly convinced the trial court in this case should have dismissed plaintiffs' action because of a complete failure to show that the claimed negligence of the defendant was the cause of plaintiffs' claimed damages. If it can be held in this case that a fact question is presented by reason of the evidence disclosed there is no limitation whatsoever in the matter of submitting cases to the jury, or, as in this case, to the court for its determination of the facts. Apparently the majority desire to put no limitation on the submission of fact questions to a jury, or to a court, as a trier of the facts. I am not disposed to go to such an extreme and unhesitatingly express my disapproval of such a declaration of the law.

Where the evidence does not sustain the findings of the trial court we should not follow it. We so held in a unanimous decision in Swift v. Petersen, 240 Iowa 715, 721, 722, 37 N.W.2d 258, 261, where we stated:

"It is true, as argued by appellee, that since a jury was waived the findings of the court have the force of a verdict, but it does not follow that where the evidence does not sustain the findings we must accept them. Whether the trial be to the jury or to the court, without a jury, the correct doctrine is well stated in Anfenson v. Banks, supra, Justice Weaver speaking, where it is said at page 1119 of 180 Iowa, page 625 of 163 N.W.:

" 'The true rule in this, as in the trial of other jury issues, is that, at the close of all the testimony, if, to the judicial mind, the evidence, tested by the law of the issues and the rules of evidence, is not sufficient to justify a jury fairly and reasonably in finding a verdict for the plaintiff, the court should so direct the jury.' Citing Pleasants v. Fant, 89 U. S. 116, 22 L. Ed. 780."

This rule finds application in this case. I would reverse.

HAYS, THOMPSON and LARSON, JJ., join in this dissent.